[No. 23158. Department One. July 25, 1931.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM STINGLEY *et al., Appellants.*[1]

*Jno. H. Bruff,* for appellant.

*Richard B. Ott,* for respondent.

MITCHELL, J.—William Stingley, Herman Hoop and Frank Simons were jointly informed against for the crime of grand larceny committed in Adams county, by unlawfully and feloniously stealing and carrying away six head of cattle, of greater value than twenty-

[1] Reported in 2 P. (2d) 61.

five dollars, to wit, three hundred dollars or thereabouts, being the property of one Oscar Danielson. Defendant Hoop confessed, later pled guilty, and was the principal witness against the other defendants, who, being tried jointly, were found guilty by a jury. Stingley and Simons have appealed from a judgment against them on the verdict.

There was evidence that Stingley and his family lived on a ranch belonging to Simons, in Adams county, on September 10, 1930. Hoop testified that, by previous appointment, he left his truck at an abandoned barn near the Stingley residence to take away cattle he knew were to be stolen, and that about nightfall, after all three had stayed around Stingley's home that day, Stingley and Simons drove six head of cattle to the barn, where they loaded the cattle on Hoop's truck, which was driven away by him to Roslyn, Kittitas county, where the cattle were sold the next day, September 11, 1930, for $81 in cash, which he kept as his part of the proceeds of the crime, and a check for $200.05, payable to him, and which he endorsed and delivered to Simons to be divided between Simons and Stingley. There was ample evidence that the cattle were the property of Oscar Danielson, who testified that they were being pastured in Adams county, Washington, near the Stingley residence, and that they were stolen from his pasture.

Stingley had two sons attending school, one, Preston, twelve years of age, who, his teacher testified, would show a mentality test of the average eight-year-old child, and the other, Chester, ten years of age. On September 24, 1930, two weeks after the cattle were stolen, the prosecuting attorney and the sheriff of the county, together with the defendant Hoop, went to the school the boys were attending, and first called out

Preston, and, after considerable time, procured a written statement signed by him which, after stating his age, says:

"About 2 weeks ago as near as I can remember Mr. Frank Simons came out to our place and staid over night and he got there about dark. He slept in the same room with us. We got up about 5:15 and did the chores & had breakfast and just as we got ready to go to school the man Hoop came walking up to our house. Mr. Hoop ate breakfast alone. We went to school & came back about 5 o'clock P. M. and Simons, Hoop and my dad were still there. We all ate supper together. Dad & Mr. Simons rode away on 2 horses. One was a big brown horse. The other horse was a big black club footed horse with 3 white feet. After they came back Simons took the haul of sheep and drove off. The sheep were loaded before they left. This is an honest & true statement as I know it is."

The proof shows that, upon allowing Preston to return to the schoolroom, Chester was called out and interviewed, but no written statement was taken from him.

Evidently for the purpose of corroborating Hoop and proving that all three of the defendants were about the scene of the crime about the time it was committed, these two boys were called as witnesses for the state, and it is upon that testimony and the examination of them as witnesses and the so-called impeachment of them that the first assignment of error is predicated.

Preston, upon being sworn, was examined in an apparently friendly way as to his age, grade in school, the length of time he had lived with his parents in the county, the kind of house in which he lived, etc., and, without being asked a single question as to whether Frank Simons, Herman Hoop, or the boy's father, one or more of them, were at the boy's home about two weeks before the written statement was signed, or at

any other time; or whether the boy's father and Frank Simons rode away on horses; or whether Frank Simons came back to the house for a load of sheep; or any similar question as to what, if anything, occurred at the boy's home, the prosecuting attorney immediately commenced to question him about what occurred at the schoolhouse on September 24, 1930, with reference to the written statement signed by him.

He asked the boy if he knew or remembered seeing him or Mr. Hoop, which the boy answered in the negative. He was shown the written statement and asked if the signature on it was his, and the boy said that it was. The written statement was marked "D" for identification. Upon having the boy admit his signature on the identification, his attention was called to the sheriff and Hoop, both of whom were in the court room, and asked if he had ever seen them, to which the boy answered, "Not that I remember of." Asked if they were not present when the witness signed the written statement, counsel for appellants objected because it was an improper attempt at impeachment. The prosecuting attorney insisted, and the court overruled the objection. Upon having the question repeated, the witness answered, "I don't remember." The written statement was offered in evidence and, being objected to, was withdrawn for a while. The state continued to question the boy about what occurred at the schoolhouse.

Counsel for the appellants objected to all of this evidence, and moved that it be stricken and the jury instructed to disregard it for the reason that it was irrelevant, incompetent and immaterial, which objection was overruled. Counsel for appellants, however, still insisting, called the court's attention to the case of *Ferris v. Todd,* 124 Wash. 643, 215 Pac. 54, in con-

tending that the state was not entitled to ask such leading questions, manifestly intended as a foundation for the impeachment of its own witness. The court held otherwise, saying, "The rule is, where it is an adverse witness you have a right to impeach his testimony."

Then, for some six or eight pages of the statement of facts, the prosecuting attorney continued along the same line of examination concerning the interview at the schoolhouse with reference to other things mentioned in identification "D," all over the objections of the appellants, all of which questions the child answered either that he did not know or that he did not remember. Then, immediately and wholly unwarranted by any answer or testimony that the boy had given, the state presumed upon this frail-minded child the question:

"Well, you say now, Preston, that Mr. Simons and Mr. Hoop and Mr. Stingley, your father, were not all out there about two weeks before the time that we met you there in front of the Corfu schoolhouse?"

to which answer was made: "No, I never saw them there."

We call particular attention to the question and answer because, together, they constitute the only testimony given by the witness favorable to the appellants or either of them, at the trial. That is, the sum total of his affirmative substantive testimony was that he did not see the three defendants at his father's home about the date of the larceny of the cattle. The signed statement was then admitted in evidence over the repeated objection of the appellants, and marked Exhibit "D."

Then the younger boy, Chester, was called by the prosecution to testify and, after preliminary questions not important here, was questioned concerning the in-

terview with him at the schoolhouse, his ability to identify the prosecuting attorney, the sheriff and Hoop in connection with that interview, and the further question as to whether he did not at that time say that his father, Mr. Simons and Mr. Hoop were out at the boy's home together about two weeks before the interview took place, to all of which the boy answered either no, that he did not know, or that he did not remember. This testimony went into the case over the objections of the appellants that it was irrelevant and immaterial. The witness was not asked while testifying whether the defendants or either of them were at his father's home on the day in question or any other time, nor was he asked any similar question.

The state then called the sheriff and, over the objections of the appellants, had him testify that he was present at the schoolhouse at the interviews at which time Preston Stingley made the statements set out in Exhibit "D," and that Chester Stingley made virtually the same statements that his brother Preston made.

It may be that Preston Stingley's answer to the prosecuting attorney's question presuming a fact as already mentioned, had the legal effect, to that extent, of undoing prejudice otherwise caused appellants by the prosecuting attorney's questions intended as a basis for impeachment, but this we need not decide, because the judgment must be reversed for errors in other respects, and because at another trial the state surely will not attempt to impeach where there is nothing to impeach.

We have set out the record in this respect somewhat at length to more fully develop the errors upon which the case must be reversed, in which respect some further facts must be mentioned. In the state's examination in chief of Preston Stingley, while testi-

fying concerning the interview at the schoolhouse, the following, among other things, occurred:

"Q. I will ask you whether or not you did not testify this—I will ask you whether or not you didn't say you knew Mr. Hoop because he had on this coat here with the paint on it (showing witness coat). Do you remember that? A. I don't know; I don't remember it at all."

It will be noticed that the witness was not asked in the court room, the appellants being present and the witness subject to cross-examination, whether he knew Hoop because he wore the coat with the paint on it, but the question in the court room was: Didn't you at the school house (in the absence of appellants) say you knew Hoop because he had on this coat with the paint on it? The coat was marked state's identification "E." Then Hoop was called by the state and testified that the coat was his, that he wore it on September 10, and that he wore it on September 24 at the time of the interviews with the Stingley children. The coat was then admitted in evidence over the objections of appellant. Thereupon, the sheriff testified for the state that at the schoolhouse Preston Stingley said that Hoop had a coat on with paint on it.

Still further, we have seen that at the trial, when the appellants were present, Chester was not asked a single question calling for affirmative testimony concerning the defendants or either of them at or about September 10, 1930, at or about the scene of the crime, nor, indeed, anything other than as to what was said by him in the interview at the schoolhouse in the absence of the appellants. There was not a particle of testimony, or question, that he ever saw or knew of the statement signed by his brother, or that he ever noticed or heard of a coat with paint on it, and yet, after the sheriff testified to what Preston said at the

schoolhouse, including all the statements in Exhibit "D" and his recognizing the coat at that time, he, the sheriff, testified that Chester made virtually the same statements at the schoolhouse. That, of course, was pure hearsay, as, also, was his testimony of Preston's statements at the schoolhouse concerning the coat.

The jury were thus authorized, under such hearsay testimony, to conclude that the coat, Exhibit "E," taken to the jury room, corroborated the story of Hoop, the accomplice, because Hoop testified that the coat was his and worn by him about the time of the crime, and because the sheriff testified that at the schoolhouse he heard Preston identify the coat as belonging to Hoop, although both appellants were absent at that time. Further, by the introduction of this hearsay testimony the jury were invited to conclude that everything contained in Exhibit "D," the written statement signed by Preston, was to be believed, and also that the coat belonged to Hoop because the sheriff testified that he heard Chester Stingley say so, in effect, as to both, in the interview at the schoolhouse in the absence of both of the appellants.

This kind of hearsay testimony and so-called impeachment has been condemned by this court uniformly a number of times. Some of our cases so holding are *Ferris v. Todd,* 124 Wash. 643, 215 Pac. 54; *State v. Bossio,* 136 Wash. 232, 239 Pac. 553; and *State v. Phillips,* 141 Wash. 648, 251 Pac. 864, and other cases mentioned in those decisions. Hearsay testimony is not admissible, nor is one allowed to prove his case by impeachment testimony.

"Impeaching evidence never tends to prove a fact. Its only purpose is to show the unreliability of the witness." *Puget Sound National Bank of Tacoma v. More,* 159 Wash. 5, 291 Pac. 1081.

The errors mentioned concerning the hearsay testimony and purported impeachment were prejudicial to the appellants, and require a new trial. There are some other assignments of error which, upon consideration, we think are without substantial merit. A discussion of them in our opinion would not be profitable.

For the errors mentioned, the judgment appealed from is reversed, and the cause remanded with direction to grant a new trial to both appellants.

TOLMAN, C. J., PARKER, and MAIN, JJ., concur.

HOLCOMB, J. (dissenting)—It is difficult for me to understand the reasoning of the majority opinion.

Conceding that proper objections were made by appellant to the introduction of contradictory evidence on behalf of the state so that the court was apprised of the exact grounds of the objections, which is doubtful, the testimony of the two boys was affirmative, not negative; was injurious to the state and undoubtedly surprising to the state. All the preliminary examination of the boys shows that. The capacity of the boy Preston, who was before the jury, was for the jury to determine. To my mind, after examining his testimony, he showed anything but frailness of mind. He disclosed a shrewd ability to give evidence against the state and avoid entanglement. Nor do I consider that the question:

"Well, you say now, Preston, that Mr. Simons and Mr. Hoop and Mr. Stingley, your father, were not all out there about two weeks before the time that we met you there in front of the Corfu schoolhouse?"

presumed a fact without any other foundation. This boy had previously answered questions adversely to the state, contrary to his former statement. It is immaterial whether or not the question above set out was

presumptive. It was then positively answered adversely and injuriously.

Of course, none of these questions and answers are substantive evidence. The contradictory writing and other testimony were not admitted for that purpose. They were admitted by the trial court solely for the purpose of affecting the credibility of the two boys.

"The rule is that, where a party calling a witness is taken by surprise by reason of affirmative testimony prejudicial to the interest of the party by whom he was called, prior contradictory statements may be shown for the purpose of affecting the credibility of the witness." *Blystone v. Walla Walla Valley Railway Company,* 97 Wash. 46, 165 Pac. 1049.

This rule was reiterated in the *Ferris* case, cited in the majority opinion, although in that case the court held that the witness attempting to be impeached did not testify unfavorably to appellants, but merely failed to testify as favorably as appellants anticipated he would testify. This, of course, did not authorize impeachment. The same rule was reaffirmed in *State v. Bossio,* 136 Wash. 232, 239 Pac. 553, but in that case the prosecution expressly disclaimed being surprised at the testimony. The *Phillips* case, 141 Wash. 648, 251 Pac. 864, is to be distinguished upon the same situation that existed in the *Ferris* case.

In the case at bar, both boys testified positively that Hoop and Shafer were not in their house at the time and place in question. This evidence was highly prejudicial to the state, and the state undoubtedly had the right to impeach it.

It is everywhere admitted, here as well as elsewhere, that a party whose witness testifies against him is not concluded thereby. When surprised by adverse testimony, the party has the right to show that the witness had made statements of fact contrary to his testimony.

While I am somewhat uncertain about the admission of other evidence on behalf of the state as rebuttal evidence being erroneous, for which reason a new trial should be granted, which I have not had time to examine, I cannot agree with the majority upon the principal question discussed.

I therefore dissent.