[No. 22642-1-II.   Division Two.   December 17, 1999.]
THE STATE OF WASHINGTON, *Respondent*, v. ALLEN S.,
*Appellant*.

---

[41]RCW 10.93.001(2).

[42]RCW 10.93.001(4).

*Manek R. Mistry* and *Jodi R. Backlund* of *Backlund & Mistry*, for appellant (appointed counsel for appeal).

*Christopher O. Shea, Prosecuting Attorney*, and *Cynthia Cecilia Szeker, Deputy*, for respondent.

MORGAN, J. — The question in this appeal is whether a party may impeach a person who claims at trial not to remember anything relevant to the case. The answer is no.

S is the father of two sons, J and B. J is the older, B is the younger.

Sometime before April 5, 1996, J alleged that S had been

sexually abusing him. S was then arrested and jailed. The same evening, B was asked by his grandmother whether anyone "had touched him where they wasn't [sic] supposed to."[1] B replied, "[N]o."[2]

On April 5, 1996, B was interviewed by Deputy Larry Dunn of the Clallam County Sheriff's Department. According to Dunn's later testimony, Dunn asked B "if his dad had touched him in a way that made him uncomfortable such as touching his privates."[3] B responded, "[M]y dad didn't do any nothing [sic]."[4]

Later in the day on April 5, B asked to see Dunn again. During this second interview, B said, "[M]y dad raped me."[5] B said he had omitted this from the first interview "[b]ecause I was scared."[6]

On April 8, 1996, B was seen by a pediatrician. B told her that his father had "put his privates in my butt and in my mouth almost every day for three years."[7] She observed "multiple bruises and scrapes of varying ages on his body,"[8] but no physical signs of "trauma . . . to [the] rectum."[9] She thought that "a normal exam can be compatible with chronic sodomy because of the normal healing capacity of the rectum."[10]

On February 21, 1997, the State charged S with the first degree child rape of B (Count I) and the second degree child rape of J (Count II). The rape of B was alleged to have occurred on or about April 2, 1996.

---

[1] Report of Proceedings (RP) at 276.

[2] RP at 277.

[3] RP at 247.

[4] RP at 109.

[5] RP at 109.

[6] RP at 110.

[7] RP at 135.

[8] RP at 138.

[9] RP at 141.

[10] RP at 141-42.

In April 1997, a jury acquitted on Count II but could not reach a verdict on Count I. The State sought a retrial on Count I. It also alleged for the first time that S was a persistent offender.

In May 1997, Josh Spry was an inmate in the Clallam County Jail. He had a felony record and was again facing felony charges. He asked to be interviewed by a sheriff's deputy, and on May 22 Deputy Charles Fuchser responded. Spry told Fuchser that "he was willing to provide information about [S] and others so he could cut himself a better deal."[11] Fuchser did not agree to a deal, but Spry nonetheless described jailhouse conversations between himself and S. In those conversations, according to Spry, S had admitted to getting "high on crank" and doing "some fucked up things to his children."[12] Fuchser sent the prosecutor a police report that incorporated Spry's comments.

Retrial commenced on September 30, 1997. Witnesses included B, Dunn, Spry, and Fuchser. B testified that on a "whole bunch" of occasions,[13] S had "stuck his privates in my butt."[14] Pain had resulted, and his "butt" had "bled."[15] The most recent occurrence was about three days before S's arrest.

Before Spry took the stand, the prosecutor told the court, outside the presence of the jury, that she had recently tried to interview Spry at the state prison where Spry was presently incarcerated. Spry had told her that she "would hear what he had to say when he took the witness stand."[16] As a result, she was concerned about what Spry would say in front of the jury, and she wanted to preview his testimony out of the presence of the jury. She stated:

---

[11]RP at 217.

[12]RP at 213-14.

[13]RP at 111.

[14]RP at 110. B also alleged two instances of oral-genital intercourse. RP at 111.

[15]RP at 111.

[16]RP at 198.

[W]hat I would like to do to clarify any problems before we get in front of the jury is have Mr. Spry in here, allow him to read the report that Det. Fuchser made which is one and a quarter pages of what Mr. Spry told Det. Fuchser . . . and ask him if that is what he intends to testify to and, if he says yes, have him testify. If he says no, I am sunk. If he testifies other than . . . he says he is going to testify . . . I think I should be allowed to put Det. Fuchser on for impeachment and the jury is entitled to a limiting instruction.[17]

After a question from the court, the prosecutor reiterated:

I think perhaps the best way to handle it [is] out of the presence of the jury, give him an opportunity to read what he told Fuchser and, if he denies saying it, we don't have a witness. If he says he is going to testify to what is here, we put him on the witness stand and, if he does so, we don't need Det. Fuchser. If he doesn't testify as to what is here, then I will need Det. Fuchser.[18]

The trial court declined to preview Spry's testimony outside the presence of the jury. Instead, it directed the prosecutor to use the following procedure in front of the jury:

If Mr. Spry gets on the witness stand and says nothing happened, nothing was said to me, under [ER] 613 you can [ask] him; Did you not tell Fuchser in an interview that [S] said this to you. If he denies that, then you can bring on Fuchser. If he admits that, then we are done. That is the way. But you will have to first ask him . . . what occurred in jail between he and [S] and did [S] say anything and, if he testifies to what he says in the report, fine. If not, you can use the report to ask him whether or not he made some other statements to Deputy Fuchser.[19]

When the jury came back in the courtroom, Spry testified as follows:

---

[17]RP at 199-200.

[18]RP at 200.

[19]RP at 202-03.

Q: Do you recall talking to Det. Fuchser and Officer Kovatch about statements that [S] made to you?

A: No, I don't recall.[20]

. . .

Q: Did you tell Det. Fuchser and Officer Kovatch that you were going to try to work out some kind of a deal of some kind?

A: I just told you I don't recall talking to detectives about any of those statements you told me I made. I told you that the other day and I tell you the same thing now.[21]

. . .

Q: Did you tell Deputy Fuchser that the defendant, [S], told you that he did some things to his kids when he was high on crank?

A: I don't recall saying nothing like that.

Q: Did you tell Fuchser that [S] told you that he doesn't know everything that he did because he was blacked out?

A: Again, I don't recall saying anything like that.

Q: Do you recall telling Fuchser that [S] told you that he quote "did fuck around with my kids but part had to do with me being on crank and part had to do with me blacking out"?

A: (Witness shakes head back and forth.)

Q: You don't recall telling the deputy that?

A: I don't recall.[22]

In accordance with the trial court's earlier direction, the prosecutor then called Fuchser. He testified:

Q: [D]id you have a conversation in the Clallam County Jail with a person known to you as Joshwa Spry?

---

[20]RP at 205.

[21]RP at 205-06.

[22]RP at 206.

A: Yes, I did.[23]

. . .

Q: Could you tell us exactly . . . what the defendant [S] told Spry that the defendant did?

. . .

A: He said that he did—and I will quote—he said that "he did some fucked up things to his children."

. . .

Q: What else did Mr. Spry tell you that [S] told Mr. Spry?

A: He said that he didn't remember everything he did because he was high on crank.

Q: Did Mr. Spry tell you anything else that [S] told him?

A: He said that he had talked to him again about the same thing. Information was basically the same.[24]

At the end of the evidence, the trial court gave a limiting instruction. It stated:

Evidence has been introduced in this case by Deputy Charles Fuchser on the subject of Joshua Spry's testimony for the limited purpose of impeaching Joshua Spry. You must not consider this evidence for any other purpose.[25]

The jury convicted, and the trial court imposed a sentence of life without possibility of parole. S then filed this appeal, in which we consider one dispositive issue, two additional issues that could affect the remedy on appeal, and one issue that is likely to recur on retrial.

I

The dispositive issue is whether the trial court erred by

[23]RP at 211.

[24]RP at 213-14.

[25]Clerk's Papers at 64.

admitting, through Fuchser's testimony, the out-of-court statements that Spry made to Fuchser on May 22. S says yes, while the State says no.

Fuchser's testimony was admitted to impeach Spry's testimony. Thus, we analyze (A) who can impeach; (B) who can *be* impeached; and (C) the nature of the evidence by which impeachment can be accomplished. Then, we apply our analysis to the facts here.

## A

ER 607 addresses the question of who can impeach. It provides, "The credibility of a witness may be attacked by any party, including the party calling the witness." It eliminates Washington's old rule that a party cannot impeach his or her own witness—even if the witness' credibility is a fact of consequence to the action—unless the party is surprised and damaged.[26] ER 607 has nothing to do with the question of who can *be* impeached, and it does *not* permit a person to be impeached when his or her credibility is not a fact of consequence to the action.

## B

Who can *be* impeached is a question associated with relevance. Under ER 402, all evidence must be relevant. Under ER 401, evidence is relevant if it has "any tendency" to make more or less probable than otherwise a fact of consequence to the action.

Evidence offered to impeach is relevant only if (1) it tends to cast doubt on the credibility of the person being impeached, and (2) the credibility of the person being

---

[26]5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE at 269 (4th ed. 1999) ("When adopted, Rule ER 607 reversed the traditional common-law prohibition against impeaching one's own witness."); FED. R. EVID. 607 advisory committee's note, 56 F.R.D. 183, 266 ("The traditional rule against impeaching one's own witness is abandoned as based on false premises."). Cases exemplifying Washington's former rule include *State v. Green*, 71 Wn.2d 372, 378, 428 P.2d 540 (1967), and *State v. Thorne*, 43 Wn.2d 47, 49, 260 P.2d 331 (1953).

impeached is a fact of consequence to the action. The second of these elements is the question of who can be impeached. If a person's credibility is a fact of consequence to the action, the jury needs to assess it, and impeaching evidence may be helpful. If a person's credibility is not a fact of consequence to the action, the jury does not need to assess it, and impeaching evidence could not be helpful. Thus, a person may be impeached if his or her credibility is a fact of consequence to the action,[27] but not if his or her credibility is *not* a fact of consequence to the action.

Five cases illustrate when a person's credibility is *not* a fact of consequence to the action. In *State v. Robbins*,[28] a man named Leader was called to the stand. He refused to testify, claiming his right against self-incrimination. The other party wanted to impeach with a prior statement, but failed to make an offer of proof. The Supreme Court noted (though it did not hold) that impeachment was not permissible because "there was nothing to impeach."[29]

In *State v. Washburn*,[30] a man named Morgus was called to the stand. The trial court allowed him to testify over objection. Later, the trial court reversed its ruling, sustained the objection, and struck Morgus' testimony. The other party still wanted to impeach with a prior inconsistent statement, but the trial court would not allow it. The Supreme Court held that where Morgus' testimony had been stricken, the attempt to impeach was "certainly improper."[31]

In *State v. Stingley*,[32] boys named Preston and Chester were called to the stand. Neither was asked "a single ques-

---

[27]This assumes, of course, no other valid objection.

[28]*State v. Robbins*, 25 Wn.2d 110, 169 P.2d 246 (1946).

[29]*Robbins*, 25 Wn.2d at 113. *See also* 5A KARL B. TEGLAND, WASHINGTON PRACTICE § 255, at 306 (3d ed. 1989) ("If a witness has not yet testified, the witness's prior out-of-court statements are, of course, inadmissible because there is no testimony to impeach.").

[30]*State v. Washburn*, 116 Wash. 97, 99, 198 P. 980 (1921).

[31]*Id.* at 99.

[32]*State v. Stingley*, 163 Wash. 690, 2 P.2d 61 (1931).

tion calling for affirmative testimony concerning the defendants . . . at or about the scene of the crime."[33] Rather, each was asked solely about statements that he had made to the prosecutor and sheriff before trial. Each claimed not to remember anything he was asked about, and each was impeached with his prior statements. The Supreme Court held that the impeachment was improper because neither boy had given any substantive testimony.

In *State v. Delaney*,[34] a man named Bird was called to the stand. He said he could not remember anything he was asked about. He was then impeached with prior inconsistent statements. The Supreme Court reversed because Bird "had not made an affirmative statement of any admissible evidentiary fact favorable to the defense, or unfavorable to the prosecution, which called for contradiction by impeachment or otherwise."[35]

In *Kuhn v. United States*,[36] a man named Lee Yuk was called to the stand and asked a number of questions. He said he could not remember anything pertinent to the case. He was then impeached with his prior inconsistent statements. The trial court soon reversed itself and struck the offending material. The Ninth Circuit stated that "where [a person] gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment

---

[33]*Id*. at 696. When the Supreme Court used the quoted language, it was referring only to one boy, Chester. Elsewhere, however, the opinion shows that the same was true for the other boy, Preston, subject to a minor exception (*see* 163 Wash. at 694) that the Supreme Court deemed immaterial.

[34]*State v. Delaney*, 161 Wash. 614, 619, 297 P. 208 (1931).

[35]*Id*. at 618. Washington cases that are more or less similar include *State v. Bossio*, 136 Wash. 232, 239 P. 553 (1925); *Ferris v. Todd*, 124 Wash. 643, 215 P. 54 (1923); *State v. Catsampas*, 62 Wash. 70, 112 P. 1116 (1911); and *State v. Simmons*, 52 Wash. 132, 100 P. 269 (1909).

[36]*Kuhn v. United States*, 24 F.2d 910 (9th Cir.), *cert. denied*, 278 U.S. 605, 49 S. Ct. 11, 73 L. Ed. 533 (1928).

. . . .''[37] It concluded that the trial court had erred, but that the error had been cured when the trial court struck the offending material.[38]

Three cases illustrate when a person's credibility *is* a fact of consequence to the action. In *State v. Hancock*,[39] the defendant's wife "gave much testimony helpful to her husband's defense."[40] The State then impeached her with her prior inconsistent statements. The Supreme Court affirmed, stating:

> The trial court did not err in permitting Detective Ostrander to testify about the substance of the out-of-court statement made to him by [the defendant's wife]. *Since she did give testimony which affirmatively supported the defense*, the subsequent impeachment of her testimony was proper.[41]

In *State v. Lavaris*,[42] the defendant confessed to murder-

---

[37]*Kuhn*, 24 F.2d at 913. Cases reiterating the same language include *United States v. Cunningham*, 446 F.2d 194, 197 (2d Cir.), *cert. denied*, 404 U.S. 950, 92 S. Ct. 302, 30 L. Ed. 2d 266 (1971) and *Taylor v. Baltimore & Ohio R.R.*, 344 F.2d 281, 283-84 (2d Cir.), *cert. denied*, 382 U.S. 831, 86 S. Ct. 72, 15 L. Ed. 2d 75 (1965).

[38]Incidentally, *State v. Agren*, 28 Wn. App. 1, 622 P.2d 388 (1980), is significant for what it omits. The trial in that case concerned a fight in the parking lot of a restaurant. The defendant's wife testified that she had been inside the restaurant; that she had not observed any fighting in the parking lot; and that she had not asked anyone in the restaurant to go out to the parking lot and check on her husband. A man named Hinke testified that he had been in the restaurant at the time of the fight. He had been "very intoxicated" and could not presently remember anything about the matter. A woman named Brodhun testified that Hinke told her, on the night of the fight, that the wife had asked him (Hinke) to go out to the parking lot "because she was concerned her husband was in a fight." *Id.* at 9. The State claimed that Brodhun's testimony was admissible to impeach the Defendant's wife, but this court disagreed. (In this respect, the *Agren* case is the same as *State v. Williams*, 79 Wn. App. 21, 902 P.2d 1258 (1995) and *State v. Johnson*, 90 Wn. App. 54, 950 P.2d 981 (1998)). Neither party claimed that Brodhun's testimony was admissible to impeach Hinke, the man "who had testified that he did not recall seeing [the defendant's wife] and did not remember whether anyone asked him to do anything." *Agren*, 28 Wn. App. at 10.

[39]*State v. Hancock*, 109 Wn.2d 760, 748 P.2d 611 (1988).

[40]*Id.* at 761.

[41]*Id.* at 767 (emphasis added).

[42]*State v. Lavaris*, 106 Wn.2d 340, 721 P.2d 515 (1986).

ing the victim, and the confession was admitted at his first trial. On appeal, the Supreme Court reversed because the confession had been obtained unlawfully. On retrial, a man named Castro testified to "the circumstances (dates, times and places) leading up to the murder."[43] He also testified that he himself was "at the scene of the crime the night before the murder";[44] "that he did not remember seeing either [the victim] or [the defendant] at the apartment";[45] and that he had not been present when anyone was killed. He was then impeached with his own prior inconsistent statements. The Supreme Court affirmed, apparently for two reasons: Castro had given testimony "essential in many areas of the State's case,"[46] and "the State did not call Castro for the primary purpose of . . . impeach[ing] him with testimony that would have been otherwise inadmissible."[47]

In *State v. Newbern*,[48] the defendant was charged with intentionally shooting Jones. Jones testified at trial that the defendant shot her by accident. She was then impeached with her own inconsistent statements. Affirming, we said:

If a witness does not testify at trial about the incident, whether from lack of memory or another reason, there is no testimony to impeach. TEGLAND, § 256, at 310. *See Kuhn*, 24 F.2d at 913 (improper to impeach witness who fails to give testimony). But conversely, even if a witness cannot remember making a prior inconsistent statement, if the witness testifies at trial to an inconsistent story, the need for the jury to know that this witness may be unreliable remains compelling. *See generally Hancock*, 109 Wn.2d at 765. Here, Jones testified to an inconsistent

[43]*Id*. at 346.

[44]*Id*.

[45]*Id*. at 342.

[46]*Id*. at 346.

[47]*Id*. at 347.

[48]*State v. Newbern*, 95 Wn. App. 277, 975 P.2d 1041, *review denied*, 138 Wn.2d 1018 (1999).

story when she said the shooting had occurred by accident. Thus, the trial court did not err in allowing the State to use Jones's [inconsistent pretrial] statement to impeach her trial testimony.[49]

Parenthetically, ER 806 shows that a person can be impeached even though he or she never appeared at trial, so long as his or her credibility is a fact of consequence to the action. ER 806 provides that "[w]hen a hearsay statement [i.e., a statement offered to prove the truth of the matter asserted[50]] . . . has been admitted in evidence, the credibility of the declarant may be attacked . . . by any evidence which would be admissible . . . if [the] declarant had testified as a witness."

■■ Based on the foregoing, we conclude that a person may be impeached if his or her credibility is a fact of consequence to the action,[51] but not otherwise.[52] We further conclude that a person's credibility is *not* a fact of consequence when he or she fails to say anything pertinent to the case, regardless of whether he or she takes the witness stand. Examples include, but are not necessarily limited to, the person who refuses to testify;[53] the person whose testimony is stricken;[54] and the person who claims not to remember anything pertinent to the case.[55] As a respected commentator explains, "If the witness claims a total lack

---

[49]*Id*. at 293-94.

[50]ER 801(c).

[51]*Hancock*, 109 Wn.2d 760; *Lavaris*, 106 Wn.2d 340; *Newbern*, 95 Wn. App. 277; ER 806.

[52]*Robbins*, 25 Wn.2d 110; *Washburn*, 116 Wash. 97; *Stingley*, 163 Wash. 690; *Delaney*, 161 Wash. 614; *Kuhn*, 24 F.2d 910.

[53]*Robbins*, 25 Wn.2d 110.

[54]*Washburn*, 116 Wash. 97.

[55]*Stingley*, 163 Wash. 690; *Delaney*, 161 Wash. 614; *Kuhn*, 24 F.2d 910; *see Agren*, 28 Wn. App. 1.

of memory and gives no substantive testimony on the factual issue at hand, a prior statement by the witness is inadmissible regardless of whether the lapse of memory is genuine because . . . there is simply no testimony to impeach."[56]

These conclusions can also be expressed in terms of the *Hancock/Lavaris* "primary purpose" rule. *Hancock* and *Lavaris* state that even though a party is no longer prohibited from impeaching his or her own witness, he or she "may not call a witness for the primary purpose of eliciting testimony in order to impeach the witness with testimony that would be otherwise inadmissible."[57] When the credibility of the person being impeached is a fact of consequence to the action, the impeaching party may be offering the evidence for either of two purposes—to impeach or to prove its substance—and the impeaching party's "primary purpose" may be open to debate. But when the credibility of the person being impeached is not a fact of consequence to the action, the impeaching party's purpose cannot be impeachment, and its "primary purpose"—indeed, its *only* purpose—is to admit the evidence for substantive use.

Finally, our conclusions are limited to the type of situation in which the person on the stand says nothing pertinent to the merits of the case. We do not consider the situation in which a person who gives in-trial testimony on part of the merits, so that his credibility is a fact of consequence to the action, and then is asked to relate his pretrial statement on a different part of the merits.

---

[56]5A TEGLAND, *supra* § 256 at 310.

[57]*Hancock*, 109 Wn.2d at 763; *Lavaris*, 106 Wn.2d at 345 (citations omitted). We are uncertain whether this rule makes the admissibility of impeaching evidence depend on the proponent's subjective state of mind. If it does, we know of no similar rule of evidence, and we question its wisdom. If it does not, perhaps the proponent's "primary purpose" should be judged by using ER 403. In other words, the proponent's "primary purpose" should be determined by balancing probative value (the effect of the evidence when properly used to impeach) against unfair prejudice (the effect of the evidence when improperly used to prove its substance). *See* JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE 607-20-22 (1975).

The concern there is hearsay;[58] the concern here is relevance.[59]

## C

Even if the person being attacked is one who can be impeached, the particular evidence being offered must still be (1) relevant to impeach,[60] and (2) either nonhearsay or within a hearsay exemption or exception.[61] Although the particular evidence may fall into any of at least five categories,[62] the particular evidence in issue here is a prior out-of-court statement.

### 1

A prior statement is relevant to impeach, as already seen, if (1) it tends to cast doubt on the credibility of the person being attacked, and (2) the credibility of the person being attacked is a fact of consequence to the action. The second

---

[58]*See* 1 McCORMICK ON EVIDENCE 127-28 (John William Strong ed., 4th ed. 1992) ("These limitations are explainable only as attempts to safeguard the hearsay policy by preventing the party from proving the witness' prior statements in situations where it appears that its only value to the proponent will be as substantive evidence of the facts asserted."). *See also* TEGLAND, *supra* at 307, which states as follows:

> Occasionally counsel has a potentially damaging statement at hand, but the witness has not yet given any testimony that is contrary to the statement. In this situation, the courts do not allow counsel to ask the witness whether he made the prior statement and then, upon denial, to introduce the statement into evidence under the guise of impeachment. The statement is objectionable as hearsay and inadmissible unless it is within some exception . . . . If the rule were otherwise, a party could reveal virtually any out-of-court statement to the trier of fact, whether or not admissible, simply by demanding to know whether the witness made such a statement.

[59]Nor do we consider statements admitted for substantive use under a hearsay exemption or exception such as ER 801(d)(1)(i). We limit our consideration to statements offered for impeachment use.

[60]ER 402.

[61]ER 802.

[62]It is usually said that the categories are mental or physical deficiency; bias; character for untruthfulness; contradiction by others; and self-contradiction by one's own prior inconsistent statement. *E.g.*, McCORMICK ON EVIDENCE § 33 at 124 (John W. Strong, et al., eds., 5th ed. 1999); 5C TEGLAND, *supra* at 269.

element defines who can be impeached and was discussed above. The first element is the one we now address.

When a prior statement is inconsistent with another statement, it tends to cast doubt on the credibility of whoever made the other statement. Suppose, for example, that A and B witness the same accident. A later says that the blue car ran· the red light. B later says that the blue car had the green light. A's statement tends to cast doubt on B's credibility, and B's statement tends to cast doubt on A's credibility. It does not matter, when considering relevance as opposed to hearsay, that A's and B's statements were not made by the same person.[63]

## 2

To be nonhearsay when offered to impeach, a prior statement must cast doubt on credibility *without regard to the truth of the matters asserted in it.*[64] Generally then, it must have been made by the same person whose trial testimony is being attacked. As we recently explained:

> To say that a witness' prior statement is "inconsistent" is to say it has been compared with, and found different from, the witness' trial testimony. This comparison, *without regard to the truth of either statement*, tends to cast doubt on the witness' credibility, for a person who speaks inconsistently is thought to be less credible than a person who does not. Thus, to the extent that a witness' *own* prior inconsistent statement is offered to cast doubt on his or her credibility, it is not offered to prove the truth of the matter asserted, it is nonhearsay, and it may be admissible "to impeach."

This reasoning does not extend to situations in which the prior

---

[63]This is a basic difference between "impeachment by contradiction" and "impeachment by prior inconsistent statement." *See Jacqueline's v. Mercantile Stores*, 80 Wn.2d 784, 788, 498 P.2d 870 (1972); *State v. Agren*, 28 Wn. App. at 9-10.

[64]*See* ER 801(c).

inconsistent statement was made by someone other than the trial witness. If A's prior out-of-court statement is inconsistent with B's trial testimony, A's statement casts doubt on B's credibility if *A's statement is true*; but A's statement does not cast doubt on B's credibility *if A's statement is not true*. In this situation, A's statement is offered to prove the truth of the matter asserted, even though it also is offered "to impeach" B.[65]

## D

We apply our analysis to this case by making four observations. First, Spry's out-of-court statements were inconsistent with his trial testimony.[66] Second, the inconsistency tended to cast doubt on the credibility of Spry's trial testimony; it seems highly unlikely that he asked Fuchser to come to the jail on May 22, told Fuchser that S had confessed to molesting S's children, then genuinely lacked all recollection at the time of trial. Third, the State was a party entitled to impeach Spry—if but only if Spry's credibility was a fact of consequence to the action (and assum-

[65]*State v. Williams*, 79 Wn. App. 21, 26-27, 902 P.2d 1258 (1995), (citations omitted) (citing *Singer v. Metz*, 101 Wash. 67, 72, 171 P. 1032 (1918), and *Miller v. Kennedy*, 11 Wn. App. 272, 291, 522 P.2d 852 (1974)). *See also State v. Johnson*, 90 Wn. App. 54, 64, 950 P.2d 981 (1998); *State v. Agren*, 28 Wn. App. at 9-10. McCormick calls this mode of impeachment "self-contradiction" by prior statement. McCormick on Evidence, § 33 at 124 (5th ed. 1999); see also Tegland, *supra* at 293.

[66]For hearsay purposes, a person makes inconsistent statements if he or she says "I can't remember the event" on one occasion, and describes the event on another occasion. *State v. Miles*, 73 Wn.2d 67, 71, 436 P.2d 198 (1968); *State v. Stepp*, 18 Wn. App. 304, 310, 569 P.2d 1169 (1977). 4 Burr W. Jones, Jones on Evidence 1766 (Spencer A. Gard ed., 5th ed. 1958). For relevance purposes, however, it makes a real difference whether the person says "I can't remember" before trial and describes the event at trial, or, conversely, whether the person describes the event before trial and says "I can't remember" at trial. If the person describes the event at trial, his credibility will generally be a fact of consequence to the action. 3A John Henry Wigmore, Evidence § 1037, at 1043 (James H. Chadbourn ed. 1970) (if a person "has already made on the stand an assertion A [and] we wish to know whether [the person] has elsewhere made the opposite assertion A'," the person's "mere failure . . . to recollect . . . whether he made the other statement does not prevent the impeacher from offering it") (emphasis in original). If the person says "I can't remember" at trial, his credibility will not be a fact of consequence to the action, unless of course he or she makes some other statement relevant for substantive use on the merits. *See State v. Stepp*, 18 Wn. App. at 310.

ing, of course, no other valid objection). Fourth, Spry's credibility was *not* a fact of consequence to the action, for he said nothing from the witness stand that either party could have used for its truth to prove a fact of consequence to the action. We conclude that the trial court erred by admitting Spry's jailhouse statements to Fuchser, and that S is entitled to a new trial.[67]

## II

■ Briefly, we consider two of S's claims related to sufficiency of the evidence. If S is correct on either claim, he is entitled to a dismissal with prejudice as opposed to a new trial.[68]

At trial, B was never asked to state his age or birthdate. Nor did anyone establish S's age or birthdate. S now claims that the evidence is insufficient to prove that B was under twelve, an essential element of the crime charged.[69] S further claims the evidence is insufficient to prove that he was at least twenty-four months older than B, another essential element of the crime charged.[70]

S is incorrect on his first claim. Exhibit 13, a statement that B handwrote in April 1996, was admitted at trial without limitation.[71] It states that B was then ten years old. It constitutes evidence sufficient to support a finding that B was under twelve.

---

[67]Neither party argues that the error was harmless, and it obviously was not. Spry's statements were not part of the evidence at the first trial, and the jury could not reach a verdict. Spry's statements were part of the evidence at the second trial, and the jury convicted.

[68]*Smalis v. Pennsylvania*, 476 U.S. 140, 142, 106 S. Ct. 1745, 90 L. Ed. 2d 116 (1986); *Burks v. United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *State v. Crediford*, 130 Wn.2d 747, 760-61, 927 P.2d 1129 (1996); *State v. Corrado*, 81 Wn. App. 640, 647, 915 P.2d 1121 (1996).

[69]*See* RCW 9A.44.073.

[70]*See* RCW 9A.44.073.

[71]Because Exhibit 13 was offered by defense counsel, S claims that defense counsel rendered ineffective assistance. We disagree. Exhibit 13 mentioned only one instance of sexual abuse. B alleged numerous such instances at trial. Exhibit 13 was relevant to impeach B, and defense counsel clearly wanted to use it for that purpose. Tactics like that are not deficient performance.

S is also incorrect on his second claim. Exhibit 13 shows that B was ten in April 1996. Other parts of the record show that S is B's father; that S was held in the adult jail for a number of months before trial; and that S was prosecuted in adult court. These facts are sufficient to support a finding that S was at least twenty four months older than B. S is entitled to a new trial, but not to a dismissal with prejudice.

### III

Briefly, we consider one claim that may recur at retrial.[72] While Deputy Dunn was on the witness stand, defense counsel wanted to establish that Dunn knew the difference between open-ended and leading questions, and that Dunn had used "certain leading questions" while interviewing B.[73] The State objected on the ground that counsel wanted Dunn to "comment on the credibility of [B]."[74] Defense counsel responded that "[i]f [Dunn] asked [B] questions that suggested an answer . . . the relevance is that [B] has been led or coached to give certain answers."[75] The trial court sustained the State's objection.

In general, a party may show that a witness has been influenced by those around him or her.[76] This is particularly true when the witness is a child who may have been

---

[72]We decline to consider one other claim. While Dunn was testifying at trial, S wanted to cross-examine about Dunn's suspension from duty for lying to a supervisor during an investigation. The record does not show that the trial court barred such evidence, see RP at 23, and thus it does not show that S was aggrieved by a ruling. RAP 3.1.

[73]RP at 251.

[74]RP at 253.

[75]RP at 252.

[76]*State v. Roberts*, 25 Wn. App. 830, 836, 611 P.2d 1297 (1980) (defendant entitled to show parental influence on adolescent); *State v. Aponte*, 249 Conn. 735, 752, 738 A.2d 117, 127-28 (1999) (defendant entitled to show prosecutor's influence on young child); *see People v. McGravey*, 14 F.3d 1344, 1349 (9th Cir. 1994) ("Such courtroom weapons as cross-examination, contradictory evidence, evidence that a witness has been influenced by others, and argument are the time-honored methods of educating a jury on issues of credibility.").

influenced by adults; thus, a defendant may show that an adolescent has been influenced by her parents,[77] or that a young child has been influenced by the prosecutor.[78] On retrial, S is entitled to explore whether Dunn influenced B by leading or suggestive questions.

Reversed and remanded for new trial.

SEINFELD and HOUGHTON, JJ., concur.

Review denied at 140 Wn.2d 1022 (2000).

---

[77]*Roberts*, at 833.

[78]*Aponte*, 738 A.2d at 127-28; *see McGravey*, at 1349.