# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

STATE OF WASHINGTON           )   No. 71026-5-I

                 Respondent,      )   ORDER GRANTING MOTION

v.                             )   FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION

ROBERTO GONZALEZ-MENDOZA,   )

            Appellant.        )

The respondent, State of Washington, has filed a motion for reconsideration. The appellant, Roberto Gonzalez-Mendoza, has filed an answer. The court has taken the matter under consideration and has determined that the motion for reconsideration should be granted.

Now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; and, it is further

ORDERED that the opinion in the above-referenced case filed on August 10, 2015, is withdrawn and a substitute opinion be filed in its place.

Done this _19th_ day of _October_, 2015.

FOR THE COURT:

_Trickey, J_

_Becker, J._

_Spearman, J._

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | No. 71026-5-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ROBERTO GONZALEZ-MENDOZA, | ) | |
| Appellant. | ) | FILED: October 19, 2015 |

TRICKEY, J. — Roberto Gonzalez-Mendoza challenges his judgment and sentence for his conviction of rape in the first degree. He assigns error to various evidentiary rulings and to the jury instructions.

We previously concluded that instructional error warranted reversal of a deadly weapon enhancement. We granted reconsideration to again consider whether the trial court properly instructed the jury. We now affirm.

## FACTS

The complainant was working as a prostitute in downtown Seattle. According to her testimony, she had run out of condoms and was leaving to go home when Gonzalez-Mendoza rolled down the window of his pickup truck trying to get her attention. Once a price of $80.00 was established, the complainant went with Gonzalez-Mendoza. On arriving at the secluded area she designated, Gonzalez-Mendoza did not have sufficient funds. When he put his wallet back, she testified that she was expecting him to either take her back or go to an ATM (automated teller machine) to get the money.

Instead, Gonzalez-Mendoza pulled out a large kitchen knife, approximately 13 inches in length. He placed it near the complainant's throat. Gonzalez-

Mendoza forced her to perform oral sex twice. He then partially put a condom on, forcing her to have vaginal intercourse.

Afterward, Gonzalez-Mendoza drove her back to a parking lot, cursing at her to get out of the truck. The complainant testified that she was worried because he had driven past the parking lot where he had picked her up. Terrified that Gonzalez-Mendoza was going to run her down, the complainant turned the truck off and grabbed the truck's keys. Gonzalez-Mendoza followed her out and tackled her to the ground. Gonzalez-Mendoza punched her and took both his keys and her keys. She immediately called 911 and reported the license plate number of the truck.

The police took the complainant to Harborview Medical Center where a rape kit was taken. The complainant identified Gonzalez-Mendoza's photograph from a photomontage Detective Robert Kurosu gave her.

Gonzalez-Mendoza admitted to having sexual relations with the complainant, but contended it was consensual. He testified that he was married and had three children. Gonzalez-Mendoza said he decided to visit a prostitute because he was having trouble with his wife and that "[he] wasn't satisfied."[1] He admitted that he had both oral and vaginal sex with the complainant, but that it was consensual. He claimed that the complainant asked for more money after they had finished having sexual relations. He testified that she grabbed his keys, but the key that was in the ignition stayed there. Gonzalez-Mendoza stated that he

---

[1] Report of Proceedings (RP) (Aug. 13, 2007) at 10.

tackled her to recover his keys, which she had grabbed. While this was ongoing, the truck moved forward, banging into the wall. He denied having a knife.

The police arrested Gonzalez-Mendoza. The knife was not recovered.

A jury convicted Gonzalez-Mendoza of first degree rape with a deadly weapon enhancement. He contends the court made errors in its evidentiary rulings and gave an erroneous instruction on the deadly weapon enhancement.

## ANALYSIS

I.    Evidentiary Rulings

Gonzalez-Mendoza makes several evidentiary challenges. He contends the trial court erred in excluding trace biological material and evidence of the complainant's prior contact with police in which she gave a false name. He also asserts the trial court erred in admitting his prior assault conviction.

We review evidentiary rulings for abuse of discretion. State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). An appellate court will overturn the trial court's rulings on the admissibility of evidence only if its decision was manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons. State, ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Trace Evidence

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Evidence that is not relevant is not admissible. ER 402.

3

The State moved in limine to preclude trace biological material found on the anal swabs under both rape shield and relevance. The trial court reserved its ruling stating:

> All right. Then I will -- at this point I really don't see that it's relevant given the DNA [(deoxyribonucleic acid)] technician or lab technician can say anything more than trace evidence. But possibly on this issue of condom use it may go to credibility of the alleged victim. So once her cross-examination and/or her examination is completed, then I think I can determine whether or not there's any relevance to that information. As I say, I still don't see that it's of any particular prejudice to the State, but I also don't at this point see any real relevance to it, and so we will have to wait and see how the alleged victim's testimony plays out. So I will reserve on that one.[2]

After the complainant testified about her interaction with Gonzalez-Mendoza, the court considered the State's motion to exclude evidence from Amy Jagmin, the forensic scientist who analyzed the DNA. Jagmin found trace material of limited genetic information. She opined that the trace material "speaks to something less recent than the current evidence that is pertaining to this case. But with regard to actual time frames, [she] can't give specific[s]."[3]

The defense sought to impeach the victim with this evidence as proof that she had multiple partners that evening, contradicting her statement to the detective that she had only had one previously. But the complainant had already testified that she had at least two partners prior to the sexual contact with Gonzalez-Mendoza. She also testified that she had had sexual relations with her boyfriend approximately two days earlier. Because the witness could not place the trace

---

[2] RP (Aug. 6, 2007) at 95.
[3] RP (Aug. 9, 2007) at 16.

4

material in any time frame, it would be mere conjecture that it came from that evening.

Gonzalez-Mendoza argued that the evidence was admissible to show that the complainant was less than truthful because she testified that she used condoms with several of her "Johns" for various reasons. Although the complainant testified that she used condoms when working as a prostitute, she did not state that she only did so. Nor did she state that she used condoms when she had relations with her boyfriend a couple of days prior to the incident.

Although evidence offered to impeach a person is relevant if it tends to cast doubt on a person's credibility and that credibility is a fact of consequence to the action, a witness may not be impeached on a collateral matter. State v. Aguirre, 168 Wn.2d 350, 362, 229 P.3d 669 (2010). Here, the evidence of unknown trace material found on the complainant's body, although not attributable to either the defendant or the complainant, is not relevant to whether there was a rape. It does not make the existence of any fact of consequence to that determination. The trial court did not abuse its discretion in excluding this evidence.

Complainant's Prior Bad Act

The State sought to preclude the defense from soliciting information regarding the complainant's proffering a false name in her prior contact with the police. The defense argued that the evidence was admissible to impeach the complainant's credibility because she had used a false name in several instances where she had been arrested for various types of crimes. The defense agreed that the crimes which she might have been arrested for were not admissible. The

5

defense argued, however, that her giving a false identify to the police was relevant as to her credibility.

The State argued that there was only one verifiable instance where the complainant had given a false name in an unrelated incident. The information regarding the giving of a false name was obtained from an interview with a detective and a deputy prosecuting attorney where the complainant admitted that she once had given the police a false name, but was never charged with a crime relating to the incident. The State further argued that there was no evidence in the record that the complainant's giving a false name was close in time to the rape or trial, such that it would be probative of the complainant's credibility in this case.

The court ruled that it was disingenuous that the defense was prohibited from bringing up past crimes, but could somehow bring up the fact that the complainant gave a false name when confronted regarding one of those crimes. The court found the false name was not probative of the complainant's credibility as to her testimony regarding the rape.

ER 608 permits a party to cross-examine a witness about specific instances of past conduct in order to cast doubt on the witness's credibility.[4] Credibility impeachment questions must be relevant to the truthfulness of the witness's

---

[4] ER 608(b) provides:

**Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

present testimony. State v. Benn, 120 Wn.2d 631, 651-52, 845 P.2d 289 (1993). Such evidence is relevant if it casts doubt on the witness's credibility, or the witness's credibility is a "fact of consequence" to the trial. State v. Allen S., 98 Wn. App. 452, 459-60, 989 P.2d 1222 (1999). A defendant's proffered evidence "'must be of at least minimal relevance'" and he or she cannot avoid this requirement simply because that evidence is about a past crime in which the witness gave a false name. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). But a trial court may exclude evidence of specific instances of conduct for impeachment if it is remote in time. State v. Wilson, 60 Wn. App. 887, 893, 808 P.2d 754 (1991).

This evidence was essentially improper propensity evidence, which is generally inadmissible under ER 404(b) and improper impeachment under ER 608(b). The trial court did not abuse its discretion in excluding the evidence.

Defendant's Prior Assault Conviction

Gonzalez-Mendoza testified on direct examination that he visited a prostitute because he was having marital problems and was not satisfied in his marriage. On cross-examination, in response to the State's question regarding his frustration (the reason he proffered for seeking a prostitute), Gonzalez-Mendoza stated: "I'm not a person who gets irritated or I'm not an aggressive [person]."[5]

The trial court ruled that the State could cross-examine Gonzalez-Mendoza about his misdemeanor assault conviction from May 2006, but limited it to the conviction and not the fact that it was for domestic violence of his wife.

---

[5] RP (August 13, 2007) at 38.

When a party introduces evidence that would be inadmissible if offered by the opposing party, that party opens the door to the explanation or contradiction of that evidence. State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006). "[A] trial court has discretion to admit evidence that might otherwise be inadmissible if the defendant opens the door to [that] evidence." State v. Warren, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006). This court reviews a trial court's determination that a party has opened the door for abuse of discretion. Ortega, 134 Wn. App. at 626.

Here, Gonzalez-Mendoza put his character at issue by his own testimony, opening the door to the admission of evidence of his prior conviction. There was no abuse of discretion.

## II.    Deadly Weapon Enhancement

Gonzalez-Mendoza argues that his due process right was violated because the jury was not properly instructed on the definition of "deadly weapon" for purposes of the special verdict.

"Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law." Fergen v. Sestero, 182 Wn.2d. 794, 803, 346 P.3d 708 (2015). We review de novo alleged errors of law in jury instructions. State v. Brett, 126 Wn.2d 136, 171, 892 P.2d 29 (1995).

Here, the trial court instructed the jury with two different definitions of "deadly weapon." Instruction 8 defined "deadly weapon" for purposes of the underlying offense. Instruction 14 defined "deadly weapon" for purposes of the special verdict.

Instruction 8 was one of several instructions related to the underlying offense of rape in the first degree. The jury was instructed that one element of rape in the first degree was that "the defendant used or threatened to use a deadly weapon or what appeared to be a deadly weapon."[6] Consistent with the statutory definition set forth in RCW 9A.04.110(6), and the standard Washington Pattern Jury Instructions: Criminal (WPIC) 2.06.01 ("Deadly Weapon—Definition as Element—Weapons Other Than Firearms and Explosives"), Instruction 8 defined "deadly weapon" as follows:

> Deadly weapon also means any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.[7]

This instruction properly set forth the applicable definition of "deadly weapon" for purposes of the substantive criminal charge. As Gonzalez-Mendoza correctly points out, however, the definition of "deadly weapon" for purposes of the substantive criminal charge differs from the definition of "deadly weapon" for purposes of the special verdict. Compare RCW 9A.04.110(6) with former RCW 9.94A.602 (1983) (recodified as RCW 9.94A.825 by LAWS OF 2009, ch. 28, § 41).

For purposes of the special verdict, the relevant statutory definition is found in former RCW 9.94A.602, the statute in effect when Gonzalez-Mendoza committed the offense. This statute defines "deadly weapon" as follows:

> [A] deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death. The following instruments are included in the term deadly weapon: . . . any knife having a blade longer than three inches, any razor with an

---

[6] Clerk's Papers (CP) at 30.
[7] CP at 33.

unguarded blade, any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

Former RCW 9.94A.602.

Under this statute, certain instruments, including a knife with a blade over three inches in length are deadly weapons as a matter of law. These instruments "require nothing more than their existence for proof of their nature." State v. Samaniego, 76 Wn. App. 76, 81, 882 P.2d 195 (1994). In such cases, the trier of fact need not inquire into whether the instrument is a deadly weapon because of the manner of its use. State v. Sullivan, 47 Wn. App. 81, 83-84, 733 P.2d 598 (1987). Rather, the jury should be instructed that the implement is a deadly weapon as a matter of law. State v. Rahier, 37 Wn. App. 571, 576, 681 P.2d 1299 (1984).

Instruction 14 defined "deadly weapon" for purposes of the special verdict. The trial court issued a slightly modified version of WPIC 2.07.01 ("Deadly Weapon—Definition for Sentence Enhancement—Special Verdict—Knife"). Instruction 14 provided:

> For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime.
>
> A person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use. The State must prove beyond a reasonable doubt that there was a connection between the weapon and the defendant. The State must also prove beyond a reasonable doubt that there was a connection between the weapon and the crime.

A knife having a blade longer than three inches is a deadly weapon.[8]

This instruction properly informed the jury of the definition of "deadly weapon" for purposes of the special verdict in this case. The weapon alleged by the complainant was a knife with a five inch handle and a total length of about 13 inches. Consistent with the authorities just discussed, a knife with a blade over three inches in length is a deadly weapon as a matter of law.

Gonzalez-Mendoza claims that the jury instructions, as a whole, were confusing. We reject this argument. Instruction 14 expressly applied "[f]or purposes of a special verdict."[9] We presume that the jury followed all instructions given. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). In light of this language, there was no risk that the jury was confused by the deadly weapon definition contained in Instruction 8.

Gonzalez-Mendoza argues that Instruction 14 should have included language relating to the manner of the knife's use because there was a dispute at trial as to the nature of the device wielded. Assuming he can raise this argument for the first time on appeal, it has no merit. It was proper to omit language relating to the manner of use from the instruction. This language is properly included when the knife in question has a blade less than three inches in length. Here, there was no evidence that the knife had a blade of less than three inches. Rather, the testimony showed either that the knife had a blade of about eight inches or that there was no knife at all.[10]

---

[8] CP at 40.
[9] CP at 40.
[10] RP (Aug. 8, 2007) at 49-50; RP (Aug. 13, 2007) at 17, 31.

We affirm the judgment and sentence.

_____
Trickey, J

WE CONCUR:

_____
Spearman, J

_____
Becker, J.