[No. 24136. Department One. December 27, 1932.]

STATE FINANCE COMPANY, *Respondent,* v. ELWIN D. HAMACHER *et al., Appellants.*[1]

*Geo. M. Ferris* and *Williams & Cornelius,* for appellants.

*Graves, Kizer & Graves,* for respondent.

MILLARD, J.—This action was brought to recover from Elwin D. Hamacher and wife and the purchasers' surety, for breach of a contract to purchase cedar

[1]Reported in 17 P. (2d) 610.

poles. The trial of the cause to a jury resulted in verdict in favor of the plaintiff for $11,952.11, of which $10,000 (the amount of the surety bond) was against the surety. From the judgment entered on the verdict, motions for judgment notwithstanding the verdict and for a new trial having been overruled, the defendants have appealed.

Four timber licenses, renewable annually upon payment of stipulated sums, issued by the Province of British Columbia to A. W. Codd and others, authorized the licensees to "cut, fell, and carry away timber" standing upon tracts of public land (termed "timber limits") described in the licenses. Cedar poles were the only timber of value on those timber limits. The licensees entered into a written contract with Hamacher (and others, of whom no further mention is necessary, as they were not made parties to this action), under which the latter was obligated to purchase, at fifty cents each, all of the merchantable cedar poles (and to cut and remove ten thousand poles each year) above a minimum size on the timber limits. To secure the performance of the contract, Hamacher delivered to the license holders two thousand dollars in trade acceptances, which were later cashed by them, and gave a bond with the Fidelity & Deposit Company of Maryland, as surety, in the sum of ten thousand dollars.

The contract was executed April 16, 1929, and placed in escrow under an agreement that it was not to become operative until Hamacher, by personal inspection (the parties knew that, on account of rot, merchantable poles could not be manufactured from many of the trees), informed himself as to the quantity, quality and situation of the cedar timber, and thereafter concluded to consummate the contract. On May 2, 1929, the escrow holder was advised by Hamacher, to whom the contract was then delivered, that the timber was

acceptable, and that the contract should go into effect. The contract provided:

"The purchasers agree immediately to enter upon the lands above described, to erect camps, to build necessary roads, and to commence the production of cedar poles, and agree, further, to prosecute the removal of said poles in an efficient manner, cutting each area clean as the work progresses. Upon a thorough exploitation should any given area develop any percentage of defective timber as to make the cost of removing poles prohibitive, the purchasers shall not be required to manufacture such poles."

From May, 1929, to January, 1930, when they were stopped by heavy snowfall, the appellants prosecuted the work of removing the poles. Though urged by the license holders from March to May, 1930, to resume work or to surrender the contract, the appellants never did either. Economic conditions in the summer of 1930, and subsequently, precluded profitable marketing of cedar poles. In July, 1930, the appellants again inspected the timber. In August, 1930, appellants notified the license holders that they would not proceed further in attempting to remove poles as the percentage of defective timber made the cost of removing the poles prohibitive.

The license holders assigned their interest to the respondent to institute an action to recover damages for breach of the contract. The trial of the cause resulted as recited above.

Appellants first contend that the evidence was insufficient to sustain substantial recovery.

The complaint alleged the execution of the contract and its breach by the appellants. Appellants admitted execution of the contract, and that they abandoned the work under, or terminated, the contract. In justification of the breach, the appellants pleaded, in the trial of the cause they insisted, and on appeal they

urge, that, under the above quoted provision, performance of the contract was excused if the percentage of defective timber (as their cruise in July or August, 1930, disclosed) was such as to make the cost of removing the poles prohibitive; that is, the contract was a mere option. By reply, the respondent denied the affirmative allegations of the answer, and alleged that the appellants required, and were afforded, an opportunity to fully examine the land and timber before the contract became effective; and that, shortly after commencing work, the appellants were fully informed concerning all conditions of which they now complain, yet continued work without complaint until a sharp decline in the price of cedar poles rendered the contract unprofitable to the appellants.

Under the pleadings, in view of appellants' admissions, the burden rested upon the respondent to prove the damage suffered. Under appellants' theory, the burden was imposed upon them to prove that, subsequent to commencement of the manufacture of poles, they discovered the percentage of defective timber was so high as to make the cost of removing poles prohibitive. That burden, the appellants failed to sustain. The evidence amply supports respondent's position that the contract was abandoned by appellants because of economic conditions.

So, too, there was ample evidence to warrant the jury in finding that approximately thirty thousand merchantable cedar poles, including those cut by the appellants from May, 1929, to January, 1930, were on the timber limits August 4, 1930, and could be removed therefrom at a cost which would not be prohibitive. There was ample affirmative evidence adduced in behalf of respondent that, from 1926 to May, 1929, that quantity of merchantable cedar poles was on the tract in question. It will be presumed that that condition

continued until the presumption is destroyed by proof that it did not continue.

The appellants' direct evidence as to the quantity and quality of the timber in August, 1930, did not destroy the presumption arising from the respondent's evidence as to the quantity and quality of the timber at an earlier date. The appellants' evidence came from an interested source, and the jury was not bound to believe it. The jury had the right to disregard the evidence and give effect to the presumption. *Barach v. Island Empire Tel. & Tel. Co.*, 151 Wash. 279, 275 Pac. 713. That the jury did so, is indicated by the verdict.

The determination of the first and the other questions raised by the appeal is dependent upon the interpretation of the quoted provision of the contract. That provision is not ambiguous. The parties knew there was a large percentage of defective timber on the tracts. The appellants were not obligated to remove any of the poles until they were granted, as they demanded, an opportunity to inspect the timber and personally inform themselves as to the quantity, quality and situation of the timber. The inspection was for the purpose of determining whether the quantity and quality of the timber warranted the appellants in undertaking its removal. Appellants were under no obligation to manufacture any poles until they notified the escrow holder of the contract that they would accept delivery of the contract.

When they advised the escrow holder that the timber was acceptable and that the contract should go into effect, the appellants then agreed to immediately commence the production of poles and ". . . to prosecute the removal of said poles in an efficient manner, cutting each area clean as the work progresses." Pursuant to that agreement, the appellants prosecuted the

removal of poles for eight months. The work was stopped by heavy snowfall in January, 1930. Though pressed by the license holders for three months to either resume the work or surrender the contract, the work was never resumed by the appellants.

 We find no comfort for appellants in the proviso which reads as follows:

"Upon a thorough exploitation should any given area develop any percentage of defective timber as to make the cost of removing poles prohibitive, the purchasers shall not be required to manufacture such poles."

The word "exploitation," as employed in the proviso, means working up, or turning to account, the pole timber on the timber limits.

"Exploitation. The act or process of exploiting, making use of, or working up; utilization by the application of industry, argument, or other means of turning to account, as the exploitation of a mine or forest . . ." 25 C. J. 178.

Any question as to the quality or quantity of the timber was foreclosed by the appellants' inspection and their subsequent acceptance of the contract. Under the terms of their contract with the license holders, the duty then devolving upon the appellants was to exploit or turn the timber to account by cutting and making poles thereof. If that were done as to "any given area," there was "a thorough exploitation" of such area. If, in the exploitation of "any given area," there developed such a high percentage of defective timber as to make the cost of removing poles from that area prohibitive, the appellants were thereby relieved of the obligation of cutting that area clean as the work progressed, and were not "required to manufacture such poles."

During the eight months the appellants were remov-

ing the poles, there was not a suggestion, not a hint, that the timber was defective. From March until early summer of 1930, the license holders insisted upon payment by appellants for poles cut in 1929, and the appellants were continually urged to resume the work of cutting and removing the poles. Promises of payment were not kept. Finally, the license holders demanded resumption of the work or the surrender of the contract. More promises to pay were made by appellants, who refused to surrender the contract. In May, 1930, one of the purchasers, in a letter to respondent's president, stated it was the intention of the purchasers to proceed with the work of manufacturing poles as soon as finances were arranged. The writer also stated that the pole market was good. By midsummer of 1930, there was no pole market.

In July, 1930, appellants claim to have cruised the tract and discovered such a high percentage of defective timber that the cost of manufacture of cedar poles was prohibitive; that ninety-seven per cent of the timber was defective, and only four thousand poles were on the entire tract. This is not in harmony with Hamacher's report to one of the purchasers following the inspection immediately prior to acceptance of the contract. In that report, it was stated that, if the purchasers could get only fifty per cent of poles from trees that they assumed were good before cutting and that fifty per cent proved worthless after cutting, the purchasers

". . . would still get at least 20,000 poles from easily accessible timber, this not considering the timber which grew on the high ridges and which would be difficult to get and very probably defective as well. According to the contract with the bank which as you recall Bob wrote himself, we are not compelled to go to any extreme to get such timber. Both figure 30,000 possible."

One of the purchasers testified that, to make a reasonable profit, they would have to get 15,000 poles; that, if they could get 25,000 poles, they would make a large profit.

Until there was a "thorough exploitation" of the tract, the appellants were not in a position to invoke, for the purpose of relieving them from the obligation of manufacturing the poles, the provision "should any given area develop any percentage of defective timber as to make the cost of removing poles prohibitive, the purchasers shall not be required to manufacture such poles." In the first place, the theory of the appellants is not consistent with the plain meaning of the contract. In the second place, under their theory, they are not entitled to prevail, inasmuch as they did not sustain the burden of proving "exploitation" of the tract as the contract required.

The jury refused to accept as true the evidence in behalf of appellants that the percentage of defective timber was so high that it made the cost of removing poles prohibitive. The jury found, in addition to its general verdict, that

". . . there are 25,000 marketable cedar poles on the timber limits mentioned in said contract on the 4th day of August, 1930, which could be removed from said limits at a cost of which would not be prohibitive on account of the defective condition of said timber under the market conditions as they existed on the 16th day of April, 1929."

The testimony, based upon cruises made before the work was begun, of respondent's witnesses was that 31,000 to 41,000 merchantable poles of the required size were on the timber limits. Deducting therefrom 5,000 poles cut by the purchasers during their eight months' operations, there were, according to that testimony, 26,000 to 36,000 merchantable poles. The ap-

pellants' evidence, which the jury did not believe, was that only 4,000 poles were on the tract and none of those were removable except at prohibitive cost. To the jury's finding of 25,000 poles should be added 4,905 poles cut and accepted by the purchasers, but for which the purchasers had not paid. That total of 29,905 poles at fifty cents for each pole would amount to $14,952.50. From that amount should be deducted the purchasers' deposit of $2,000 earnest money and $1,000 paid on account of poles removed. The remainder is $11,952.50. The jury's verdict—a manifestly intelligent one—was $11,952.11.

The next assignment raises the question as to the measure of damages. Appellants contend that, as the respondent is still the owner of the timber licenses and entitled to the benefit of all merchantable poles remaining, the respondent cannot retain the poles and recover more than its loss due to a breach of the contract.

Respondent's assignors were licensed to remove timber from public land in British Columbia. That timber was sold to appellants, who stopped work when there was a market for the timber but refused to surrender the contract. There is not now any market for cedar poles. Unless the license holders continue to pay to British Columbia the annual license fees, unless the provincial government continues to grant to respondent's assignors licenses, and unless at some time in the future there is an available pole market, there will be no chance for the licensees to dispose of the timber. This is a contract for the sale of personal property. The poles can not be resold by the seller at a reasonable price; in fact, they can not be sold at any price. It follows that the respondent is entitled to recover the price (fifty cents for each merchantable pole) the purchasers agreed to pay.

The general rule for assessment of damages for breach of a contract of sale is to allow the seller the difference between the contract price and the market value at the time and place of delivery. Where, however, as in the case at bar, there is no market for the property after the buyer refuses to receive it, the seller is entitled to the full contract price. In discussing the subject of damages recoverable for breach of contract of sale, the annotator in 44 A. L. R., 267, said, respecting the general rule allowing the seller the difference between the contract price and the market value at the time and place of delivery:

"Where the property has a current market value, this rule results in no injustice to either party, but where there is no current market value, or other determinable pecuniary values, it is obvious that the insistence upon the general rule would result in grave injustice to the seller, who, having met all the requirements of the contract before the breach, is entitled to the full benefit thereof. In such case, and also where, without fault of the seller, or opportunity for him to make other disposition, the property is destroyed or becomes worthless after the buyer refuses to receive it, the only allowance which will fully idemnify the seller may be the full contract price."

Our examination of the record not disclosing reversible error, the judgment should be, and it is, affirmed.

TOLMAN, C. J., MITCHELL, HOLCOMB, and PARKER, JJ., concur.