**FILED**
**March 10, 2015**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31670-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ISIDRO LICON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Isidro Licon appeals his convictions for two counts of second

degree assault and one count of second degree unlawful possession of a firearm. He

argues that the trial court erroneously admitted gang evidence, erroneously admitted

testimonial hearsay, and improperly refused a material witness subpoena. He also argues

the trial court erroneously imposed legal financial obligations (LFOs) and imposed

community custody conditions on him unrelated to his convictions. We agree that the

trial court erroneously admitted testimonial hearsay, but reject Licon's other arguments

attacking his convictions. We hold the testimonial hearsay to be harmless error and

affirm Licon's three convictions. We decline to address Isidro Licon's assignment of

error regarding the entry of legal financial obligations, and we affirm his community

custody conditions.

FACTS

Sylvia Guerra and her daughter Selena Cortez are the victims of Isidro Licon's assaults. Guerra, Cortez, Guerra's fiancé Jaime Gutierrez, and Gutierrez's mother lived together in an apartment in Pasco. Isidro Licon lived one block from the Gutierrez home. Guerra spent time in jail, during which time Gutierrez's youngest brother Gumarro (Gooma) occupied her room. Guerra was released from jail on February 6, 2012. Because Guerra paid rent and Gooma paid no rent, Jaime Gutierrez ousted his brother from the home to allow the return of Guerra.

Isidro Licon and his acquaintances, Guillermo Tapia, Edgar Arroyos, Steven Morfin, and Jaime Gutierrez are all members of the Florencia 13 street gang. Sylvia Guerra was a member of the Mexican Pride Surenos gang, but cut ties with the gang four years earlier. Florencia 13 and Mexican Pride Surenos were once rival gangs. According to Guerra, Licon and she were friends who attended the same barbecues and other gatherings. According to Licon, Guerra and he were more than friends, and she sent him risqué text messages.

Witnesses, victims, and perpetrators referred to each other by gang monikers: Isidro Licon is "Traviezo," Report of Proceedings (RP) at 112[1]; Guillermo Tapia is

---

[1] Unless otherwise noted, RP refers to the Report of Proceedings from Isidro Licon's trial, including, January 2, 2013, January 3, 2013, January 4, 2013, January 8, 2013, January 9, 2013 and January 10, 2013.

2

"Habit," RP at 112; Edgar Arroyos is "Nutcase," RP at 110, 116; Steven Morfin is "Smokes," RP at 110; Jaime Gutierrez is "Smurf," RP at 186; and Sylvia Guerra is "Nacoe," or "Mousie." RP at 379.

On February 10, 2012, Guillermo Tapia drove himself and Isidro Licon around town. Tapia and Licon encountered Gooma Gutierrez, who informed them that he was no longer welcome at his brother's residence.

On the same day, Sylvia Guerra, Selena Cortez, and Jaime Gutierrez lingered at their apartment. Guerra arose to take a shower; while Cortez applied her makeup. Edgar Arroyos and Steven Morfin arrived at the apartment. Guerra afforded Arroyos and Morfin entry to the home. Guerra called Gutierrez, so he could speak to them while she showered. Arroyos sat on a couch, while playing with a gun. Guerra was not alarmed, however, because gang members routinely carry guns. Jaime Gutierrez asked Sylvia Guerra to leave the home to purchase beer.

Sylvia Guerra thought it odd that Jaime Gutierrez asked her to purchase beer, yet Gutierrez's look told her she should leave. Guerra went toward her room to retrieve shoes, when Isidro Licon and Guillermo Tapia approached the home. Guerra then "knew something was up." RP at 110.

According to Sylvia Guerra, Isidro Licon rushed into the house with a gun. Licon lifted his shirt to show Jaime Gutierrez a pistol on his waistband. Licon yelled and argued with Gutierrez. Guerra first wanted to remove herself from an internal squabble

3

among Florencia gang members. She continued to walk to her room when Licon called her a "bitch." RP at 113. Isidro Licon waved his gun and complained to Jaime Gutierrez for removing Gutierrez's brother from the home for the "bitch." RP at 113.

Sylvia Guerra responded to Isidro Licon's importuning. Guerra yelled at Licon: "don't call me a bitch unless you fuck me." RP at 153. Guerra's daughter Selena Cortez joined the argument and told Licon to stop yelling at her mother. According to Guerra and Cortez, Licon pushed Guerra aside, grabbed Cortez, and threw Cortez to the ground. Guerra lunged at Licon. Licon pushed Guerra to the side and Edgar Arroyos and Steven Morfin jumped on top of Guerra.

According to Sylvia Guerra, Selena Cortez armed herself with a kitchen knife. Isidro Licon and Cortez ran at each other and Licon wrestled Cortez onto the couch. Sylvia Guerra instructed Licon to free her daughter, while Licon told Guerra to instruct her daughter to let go of the knife. When Guerra did not respond, Licon pistol whipped Cortez.

According to Sylvia Guerra, she grew angry and threw Steven Morfin and Edgar Arroyos to one side. Isidro Licon yelled to Arroyos to "shoot the bitch." RP at 116. Arroyos did not know how to shoot a gun so he sideswiped Guerra with the gun.

Isidro Licon tells a different story. According to Licon, he knocked before entering Jaime Gutierrez's home. He shook hands with those inside. Licon asked Gutierrez: where is your brother? Gutierrez answered that Gooma is at his aunt's house.

4

Licon asked for a glass of water, and Gutierrez granted the request. Licon walked into

the kitchen, retrieved a glass of water, returned to the front room, and placed the glass on

a table.

Isidro Licon testified at trial:

> As I set it on the table Mousie, Nacoe [Sylvia Guerra] said, I can't get a hug. You can't say hello to me. I asked how come Gumarro isn't here. We referred to him as Gooma. Nacoe says right away that is none of your business. I say, can't you see two grown men are talking.
> . . . .
> Mousie [Sylvia Guerra] is just rambling about something. Jaime says something to her and they are rambling on to each other. Then I hear Jaime say well he is just asking a question. Then she again says, well, it's none of his fucking business. I look over and say, are you still on the same subject. It was over, five minutes ago. She starts getting loud. I'm like, whatever. I tell them should we ask Guillermo if he wants to give us a ride. Then by then she gets up and starts basically barking at me like a dog, not in actual bark bark mode but starts yelling. You can see spit coming out of her mouth.
> . . . .
> After she kept on, I was like just shut the fuck up, bitch, shut up and drop it.
> . . . .
> I looked back and here comes Selena. She is coming directly at me. She automatically assumes we are waiting—she automatically wants to come up to me, don't be talking to my fucking mom like that.

RP at 419-22.

According to Isidro Licon, without provocation, Selena Cortez went to the kitchen,

armed herself with a knife, and attacked him. Licon testified:

> Well, as she is coming like this I see Arroyos, which is close to the kitchen, and stand up and reach over and grabbed her forearm. She automatically turns around real fast like that. As soon as she did that, she

5

didn't have the knife up, she had it like this. When she turned around, she kind of pulled her arm up so she kind of turned around and I jumped back. So I jumped back over the table and grabbed her to where her hand was lower but I had her kind of like here. I grabbed her, went up—went to the couch and body slammed her into the couch.

. . . .

I said we need to bounce. We need to leave. And I'm like I'm going to let her go and she will get up so let's go. Arroyos is close to the door so he walks out first and Morfin is right behind him and then I get off of her and I say we are working our way onto the couch where the cushion[s] are sliding off. You know, change on the back of the couch. I have her like this. I stopped, pulled her fingers off, and grabbed her. I pushed off of her to get up myself. Once I do that, I didn't get my footing right and I stumbled. I got [m]y balance on the dresser close to the door. The door is already opened because she is exiting. I reach for the door, Selena is already on her way up, coming towards me, and I punch her in the face.

RP at 424, 428-29.

Isidro Licon insisted that he acted in self-defense when he struck Selena Cortez.

He denied attacking Sylvia Guerra.

At trial, Isidro Licon agreed to a prior conviction that precluded him from carrying a firearm. He testified that he no longer carried a gun. Nevertheless, neither side specifically questioned Licon if he carried a gun to Jaime Gutierrez's apartment on February 10, 2012.

## PROCEDURE

The State of Washington charged Isidro Licon with three crimes: second degree assault against Sylvia Guerra; second degree assault against Selena Cortez; and unlawful possession of a firearm. For the two assault charges, the State further alleged firearm and

6

gang sentence enhancements. To fulfill the gang enhancement statute, the State alleged that Licon assaulted Guerra and Cortez to obtain or maintain his membership or to advance his position in the "hierarchy of an organization, association, or identifiable group"; or "to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(s), (aa); Clerk's Papers (CP) at 207-08.

Before trial, Isidro Licon moved in limine to exclude all gang evidence. Licon argued that the sole impetus for the altercation was Sylvia Guerra's removing Jaime Gutierrez's brother from the apartment. The State argued that Licon retaliated against Guerra because she was a female member of a rival gang who disrespected him. The trial court denied Licon's motion, ruling the evidence conditionally relevant, on the ground that the gang testimony showed motive or intent for the crime and explained the interactions of the parties. The trial court also deemed the relevance outweighed the prejudicial impact of the evidence.

During trial, the trial court admitted substantial gang evidence over Isidro Licon's continuing objection. Pasco Police Officer Michelle Goenen testified that Sylvia Guerra informed her that the reason for the altercation was Licon's link to the Florencia 13 gang and Guerra's connection with the rival Mexican Pride Surenos gang. Sylvia Guerra testified that Licon was a member of Florencia 13, and members of that gang tried to

7

silence her by threatening her and her family. The court admitted three photographs that, according to Pasco Detective Justin Greenhalgh, showed Edgar Arroyos' gang affiliation.

At trial, the State called witness David Reardon, a crime analyst and gang expert with the City of Pasco Police Department. Reardon explained that the purpose of a gang is to establish a territory or monopoly, in which the gang sells drugs, through violence and intimidation. Fights can be the result of one gang interfering in another gang's area. David Reardon indicated that Isidro Licon had identified himself to law enforcement as a member of the Florencia 13 gang.

At trial, Officer David Reardon identified Sylvia Guerra as a member of the Mexican Pride Surenos gang. According to Reardon, Florencia and Mexican Pride Surenos are allied, not rival, gangs. Last, Reardon opined that the impetus for the assaults was gang-related. Sylvia Guerra insulted Licon and therefore Licon had to retaliate. According to Reardon, Guerra being a female and belonging to a different gang hastened the need for retaliation.

Neither Sylvia Guerra or Selena Cortez believed the incident to be gang-related. According to Guerra, she, contrary to Goenen's testimony, told Officer Michelle Goenen, before trial, that Licon got into an argument with her fiancé Jaime Gutierrez over Gutierrez kicking out his brother "over a dumb incident which escalated." RP at 107.

Serena Cortez previously witnessed Isidro Licon make sexual advances toward her mother. Cortez testified at trial that Licon's romantic obsession with Guerra explained

8

why he went to the apartment on February 10 and an argument ensued.

During trial, the State called Jaime Gutierrez as a witness. Defense counsel

objected to Gutierrez testifying:

> [DEFENSE COUNSEL]: Understanding that Jaime Gutierrez is
> there [sic] next witness, who has not be[en] made available to us to speak
> with. ... [O]ur understanding is he will take the Fifth. If it's anything
> otherwise, we should be entitled to interview Mr. Gutierrez.
> [THE STATE]: He has been sitting in jail for the last three weeks.
> If she [defense counsel] wanted to talk to her [him] she could have.
> [DEFENSE COUNSEL]: We've attempted to and his own attorney
> said he hasn't talked to him and earlier today he said he was going to take
> the Fifth. If it's anything different then we need to talk if he is going to
> testify.

RP at 184-85. The trial court ruled: "We will find out what he is going to say." RP at

185.

Despite assuming the witness stand, Jaime Gutierrez refused to swear an oath to

testify truthfully, stating: "I have nothing to say." RP at 185. The State asked Gutierrez

questions anyway. Gutierrez testified that he belongs to the Florencia gang, that Sylvia

Guerra "is [his] girl," and that he was with Guerra on February 10, 2012. When asked if

he recalled an incident involving Guerra and Isidro Licon, Gutierrez responded: "I don't

recall." RP at 187. Gutierrez did not recall whether Licon went by the nickname

Traviezo, whether Licon also belonged to Florencia, or whether police responded to his

residence on February 10, 2012. Gutierrez's counsel advised him not to testify and to

invoke the right to remain silent. The State continued to examine Gutierrez, who refused

9

to answer. After repeatedly answering "I don't recall" to questions, Gutierrez claimed a bad memory due to drug abuse. RP at 192.

The State of Washington later called Pasco Police Officer Eric Fox as a witness. Fox responded to the apartment on February 10, 2012, when and where he spoke with Jaime Gutierrez. The State asked Fox to repeat what Gutierrez said to him about Isidro Licon. Licon objected on the ground of hearsay. The State argued that Officer Fox's answer to the question was admissible as a prior inconsistent statement. Isidro Licon argued the testimony was not admissible as a prior inconsistent statement under ER 613 because Gutierrez did not testify, and therefore was not available to question regarding the statements. The trial court overruled the objection.

Officer Eric Fox testified that Jaime Gutierrez told him that Isidro Licon was present at his apartment on February 10 and Licon carried a firearm. The State also asked Officer Fox what Gutierrez told him about why the incident occurred:

> Q. [THE STATE]: Now can you give the complete statement as to what Mr. Gutierrez said why this offense occurred?
> A. [OFFICER FOX]: That he was in a relationship with an MPS or Mexican Pride Surenos gang member, which was S[y]lvia Guerra.

RP (Jan. 7, 2013) at 45.

Isidro Licon moved for a mistrial, arguing that Officer Fox's testimony was violative of ER 613 and Licon's rights under the confrontation clause. The trial court

10

denied the motion for a mistrial. The following day, Isidro Licon, through an agent,

served a subpoena, on Jaime Gutierrez's mother, for Gutierrez to testify at trial.

Isidro Licon called Guillermo Tapia as a witness. Tapia's testimony supported

Licon's version of the story. Isidro Licon asked Tapia whether he had discussed this case

with Jaime Gutierrez. Licon represented to the court that Gutierrez told Tapia that he

planned to take the Fifth Amendment and he was not going to lie for Guerra any longer.

Licon sought to use Tapia's testimony of Gutierrez's statement to impeach Sylvia Guerra.

The State objected:

> [THE STATE]: Objection.
> THE COURT: Sustained.
> [DEFENSE COUNSEL]: This goes to impeachment, Your Honor.
> [THE STATE]: Of what?
> [DEFENSE COUNSEL]: It was allowed in by Officer Fox. We
> should allow Mr. Gutierrez to say what was said to him about remaining
> silent.
> THE COURT: Sustained.

RP at 384. Tapia testified that Jaime Gutierrez appeared reluctant to testify, but the court

did not admit Gutierrez's out-of-court statement.

A day later, Isidro Licon tried to call Jaime Gutierrez to testify at trial:

> THE COURT: Your next witness.
> [DEFENSE COUNSEL]: He is nowhere around, Your Honor.
> [Jaime Gutierrez] was served with a subpoena.
> [THE STATE]: It was released by the Court.
> THE COURT: So.
> [DEFENSE COUNSEL]: May we approach.
> (Side bar had outside hearing of jury)

11

[DEFENSE COUNSEL]: I know I would anger the Court if I asked for a material witness warrant. I know we can get this done. That is the only way we can get that impeachment evidence through Mr. Tapia is if I get him here.

THE COURT: I'm not inclined to grant a material witness warrant at this junction of this case. I understand if it was probably more relevant I might do it. If he was one of your primary witnesses that hadn't come. I think we can see if we can't get this done. If he shows up before the State's finished I will maybe let you bring him on.

[DEFENSE COUNSEL]: I should put on the record I would have taken care of this in the beginning when he was on the witness stand, Your Honor, had I known but all of this information didn't come available to us until Friday when I spoke to Ms. Cortez then I had to track Mr. Tapia down. Luckily he was in the jail and even then it didn't become available because I didn't ask him if he had any conversation with Mr. Gutierrez. Apparently it must have happened while they were in court recently. That was something that was asked in the interview with Mr. Hultgrenn and Detective Greenhalgh. That's the only reason it wasn't done when it should have been done.

[THE STATE]: I will put on the record Mr. Guillermo Tapia Torrez he has been in jail and available. She could have interviewed him at any time. It's always been known he was the driver.

THE COURT: We will go ahead.

(Following had in open court within hearing of jury)

[DEFENSE COUNSEL]: Your Honor, based on Mr. Gutierrez not showing up, we rest and reserve if he does show up before the case is finished.

THE COURT: Thank you, Ms. Rodriguez.

RP at 466-468. Jaime Gutierrez did not later appear at trial.

After Isidro Licon rested his case, the State called Pasco Police Detective Kirk Nebeker in rebuttal. Over defense counsel's objection, Nebeker testified to the structure and rules of the Florencia gang, and that Licon was an active member. He further declared:

12

Q   What happens if you are breaking these rules?
A   It's called getting checked or sometimes they say putting a green light on the person who broke the rule. Usually they get disciplined by their own friends in the gang whether they get beat up or it could be determined as a gang in one of their meetings they will get together and come up with how they would discipline that particular person depending on the situation.

RP at 470-71.

The trial court instructed the jury that "[a] person commits the crime of assault in the second degree when he or she assaults another with a deadly weapon." CP at 98. The court further defined assault as follows:

An assault is an intentional touching or striking or cutting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive.

An assault is also an act, with unlawful force, done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 97. The trial court also instructed the jury on self-defense. During the State's closing arguments, it did not mention Jaime Gutierrez's remarks to Officer Eric Fox.

The jury found Isidro Licon guilty on all three counts: two counts of assault in the second degree, and unlawful possession of a firearm. The jury found by special verdicts

13

that Licon employed a firearm in committing each assault. Also by special verdicts, the jury found that the gang enhancements under RCW 9.94A.535 did not apply.

The trial court sentenced Isidro Licon to 86 months total confinement and community custody of 18 months. The trial court found that "the defendant is an adult and is not disabled and therefore has the ability or likely future ability to pay the legal financial obligations imposed herein. RCW 9.94A.753." CP at 29. During the sentencing hearing, the trial court did not inquire into Licon's ability to pay legal financial obligations before imposing $643 in discretionary costs. Nor did Licon object to the imposition of the costs.

The trial court also imposed the following terms of community custody:

[X]   No contact with known gang members.
[X]   No possession of gang paraphernalia including clothing, insignia, medallions, etc.
[X]   Notify the community corrections officer of any vehicles owned or regularly driven by defendant.

CP at 35.

## LAW AND ANALYSIS

On appeal, Isidro Licon contends (1) the trial court erred when it admitted gang evidence, (2) the trial court erred when it allowed Officer Eric Fox to testify to hearsay statements from Jaime Gutierrez, thus violating ER 613 and Licon's right to confrontation, (3) the trial court erred when it denied Licon's motion to issue a material witness warrant for Jaime Gutierrez, (4) cumulative error denied Isidro Licon's right to a

14

fair trial, (5) the trial court failed to consider Licon's present or future ability to pay legal financial obligations before imposing discretionary costs, and (6) the trial court erred when it imposed three community custody conditions unrelated to Licon's convictions.

Issue 1: Did the trial court err by admitting gang evidence?

Answer 1: No.

Isidro Licon challenges the admission of testimony of Sylvia Guerra regarding Isidro Licon's gang affiliation and threats she and her family received; three photos of Edgar Arroyos showing his gang affiliation; the gang expert testimony of Officer Reardon; and the gang expert testimony of Detective Nebeker. Licon emphasizes that neither Sylvia Guerra nor Selena Cortez, or the jury, believed the altercation to be gang-related. Licon argues the "large volumes of gang evidence" led the jury to conclude that he is a bad person. Br. of Appellant at 16-17. He does not challenge the testimony of the Pasco police officers as impermissible opinion testimony.

The state of Washington argues that the gang evidence is relevant because Isidro Licon responded with extreme violence to perceived insults from Sylvia Guerra and in conformity to the gang code, and a violent response to a small offense served to aggrandize both Licon and the gang in reputation and influence. According to the State, Licon also sought to improve his standing within the Florencia 13 gang to punish a fellow member, Jaime Gutierrez, for prioritizing Sylvia Guerra over his brother. Detective Kirk Nebeker explained this motive, when he characterized the conduct as "getting checked or

15

sometimes they say putting a green light on the person who broke the rule." RP at 470-71.

The trial court reasoned that the admitted photographs helped explain the interactions of the parties. The gang evidence elucidated why three other Florencia 13 members accompanied Isidro Licon to Guerra's home that day and acted in concert. According to the trial court, the evidence illuminated why Licon reacted vehemently against a female member of a different gang. The evidence was also admissible because the State sought gang enhancements. We agree.

Like membership in a church, social club, or community organization, affiliation with a gang is protected by our First Amendment right of association. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). Washington courts consistently recognize the prejudicial nature of gang evidence. *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009); *Scott*, 151 Wn. App. at 526. ER 404(b), for "other crimes, wrongs," applies to the admission of gang evidence. *State v. Yarbrough*, 151 Wn. App. at 81. ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Despite ER 404, a trial court may admit gang affiliation evidence to establish the motive for a crime or to show that defendants acted in concert. *State v. Embry*, 171 Wn.

16

App. 714, 732, 287 P.3d 648 (2012), *review denied*, 177 Wn.2d 1005 (2013). The testimony challenged on appeal showed motive, set the circumstances for the assaults, and explained why others accompanied Isidro Licon to Jaime Gutierrez's home. The testimony was needed to support the State's desire to impose gang enhancements in the sentence.

We review a trial court's evidentiary rulings under the abuse of discretion standard. *State v. Cronin*, 142 Wn.2d 568, 585, 14 P.3d 752 (2000). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Yarbrough*, 151 Wn. App. at 81. We conclude the trial court did not abuse its discretion.

By its special verdicts, the jury rejected the state of Washington's argument that Isidro Licon assaulted Sylvia Guerra or Selena Cortez in order "to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." CP at 81. Rejection of the State's theory, however, does not retroactively render the evidence irrelevant. In the trial of a case, any circumstance is relevant which reasonably tends to establish the theory of the party offering it. *Rothman v. N. Am. Life & Cas. Co.*, 7 Wn. App. 453, 456, 500 P.2d 1288, (1972).

ISSUE 2: Did the trial court err when allowing Officer Eric Fox to testify that Jaime Gutierrez told him that Isidro Licon was present at the apartment, Licon carried a

gun, and Licon assaulted Sylvia Guerra because of her gang membership?

ANSWER 2: Yes.

Isidro Licon contends the trial court erred when it allowed Officer Eric Fox to testify to statements made by Jaime Gutierrez to the officer. The State argues Officer Fox's testimony is admissible under ER 613 to contradict Gutierrez's inconsistent trial testimony. Licon argues that ER 613 did not sanction the hearsay and the hearsay evidence violated his right to confrontation.

ER 613 allows testimony of an extrinsic prior inconsistent statement of a witness, under certain circumstances. Since Gutierrez gave no inconsistent statement on the witness stand, we agree with Isidro Licon. Officer Eric Fox's testimony did not impeach earlier testimony from Jaime Gutierrez. Gutierrez refused to swear an oath to testify truthfully, invoked his right to remain silent, and, when ordered to answer, claimed he could not remember February 10, 2012.

"If the statement is offered for the purpose of showing that the witness's statement on the stand cannot be trusted because he has changed his story, it is not hearsay." ROBERT H. ARONSON AND MAUREEN A. HOWARD, THE LAW OF EVIDENCE IN WASHINGTON, § 10.05[2][c], at 10-10 (5th ed. 2013). In effect, the earlier inconsistent statement is not offered to prove the truth, but rather to show that trial testimony is unreliable. In general, a witness' prior statement is admissible for impeachment purposes if it is inconsistent with the witness' trial testimony. *State v. Lavaris*, 106 Wn.2d 340,

18

344, 721 P.2d 515 (1986); *Sterling v. Radford,* 126 Wash. 372, 218 P. 205 (1923); *Pilon v. Lindley,* 100 Wash. 340, 170 P. 1022 (1918); 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 801.18, at 365-66 (5th ed. 2007).

Generally, "'if the witness testifies at trial about an *event* but claims to have no knowledge of a material detail, or no recollection of it, most courts permit a prior statement indicating knowledge of the detail to be used for impeachment.'" *State v. Newbern,* 95 Wn. App. 277, 292, 975 P.2d 1041 (1999) (quoting 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 256, at 309 (3d ed. 1989)) (emphasis added). If the witness claims a total lack of memory and gives no substantive testimony on the factual issue at hand, a prior statement by the witness is inadmissible regardless of whether the lapse of memory is genuine because there is no testimony to impeach. *State v. Newbern,* 95 Wn. App. at 292; 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 801.22, at 371 (5th ed. 2007). The purpose of using prior inconsistent testimony to impeach is to allow an adverse party to show that the witness tells different stories at different times. *State v. Newbern,* 95 Wn. App. at 293 (1999); 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 34, at 126-27 (5th ed. 1999). From this, the jury may disbelieve the witness' trial testimony. *Newbern,* 95 Wn. App. at 293. If a witness does not testify at trial about the incident, whether from lack of memory or another reason, there is no testimony to impeach. *Newbern,* 95 Wn. App. at 293; TEGLAND, § 801.22, at 371.

19

Two of this court's opinions resolve the question on appeal with different reasoning but with a result favorable to Isidro Licon. In *State v. Newbern*, 95 Wn. App. 277, 975 P.2d 1041 (1999), a jury convicted Sirrone Newbern of attempted murder in the second degree. On appeal, Newbern claimed the trial court erred, in part, when admitting hearsay evidence.

Sirrone Newbern shot his girlfriend, Lakenya Jones, with a handgun while she stood in front of her house talking on the telephone to her former boyfriend, A.J. The next morning, Detective Bomkamp interviewed Jones at Madigan Hospital. She told the detective that, before the shooting, she received a telephone call from a former boyfriend. She said she was in her bedroom speaking on the phone when Newbern came in, told her to hang up, and pointed a gun directly at her. She said she left the bedroom and walked outside where she stood on the front step, still talking on her portable phone. Jones also said that Newbern followed her outside and told her to get off the phone and that when she replied, "No," he lifted the gun to shoulder height and pulled the trigger one time.

In *Newbern*, Lakenya Jones testified at trial and acknowledged that she received a telephone call from A.J. before the shooting. But at trial, Jones insisted that Newbern had not told her to get off the phone, that Newbern was not jealous when she spoke to A.J., that she did not see Newbern with a gun when she was outside, and that the shooting was an accident. The State then impeached Jones with the statement she made to Detective Bomkamp. Over Newbern's hearsay objection, Bomkamp testified about the

Madigan Medical Hospital interview, saying that Jones told him that Newbern pointed the gun at her twice in the space of about five minutes and shot her after she refused to get off the telephone.

On appeal, in *Newbern*, this court noted that the trial court admitted Lakenya Jones' earlier descriptions of the incident as a prior inconsistent statement. Newbern argued that it was error to admit Jones' Madigan statement because Jones testified that she had no memory of making it. The court disagreed because, even if Jones claimed she did not remember making the statement to the detective, she claimed a memory of the event contrary to the Madigan statement. Thus, the trial court did not err in allowing the State to use Jones' Madigan statement to impeach her trial testimony.

In *State v. Allen S.*, 98 Wn. App. 452, 469, 989 P.2d 1222 (1999), this court addressed the question: whether a party may impeach a person who claims at trial not to remember anything relevant to the case. The answer given was no. S. was the father of two sons, J. and B., both of whom accused S. of sexual assault. While S. awaited trial in jail, Josh Spry, another prison inmate, asked to be interviewed by a sheriff's deputy, and Deputy Charles Fuchser responded. Spry told Fuchser that he was willing to provide information about S. so he could cut himself a better deal on charges pending against him. Fuchser did not agree to a deal, but Spry nonetheless described jailhouse conversations between himself and S. In those conversations, according to Spry, S. admitted to getting high on crank and doing "some fucked up things to his children."

21

*State v. Allen S.*, 98 Wn. App. at 455. Perhaps because of the lack of a deal, Spry denied, when called to testify in S.'s trial, speaking to Fuscher. He further denied telling Fuscher that S told him he abused his sons. The State then called Fuchser to testify. Fuscher told the jury that Spry reported to him a conversation with S., during which S. admitted to abusing his sons. The trial court gave a limiting instruction that testimony of Deputy Charles Fuchser on the subject of Joshua Spry's testimony was allowed only for the limited purpose of impeaching Joshua Spry, and the jury must not consider this evidence for any other purpose.

On appeal, in *Allen S.*, this court held that the trial court erred by admitting, through Fuchser's testimony, the out-of-court statements that Spry made to Fuchser. In a law review style opinion, the *Allen S.* court observed that the State was a party entitled to impeach Spry, but only if Spry's credibility was a fact of consequence to the action. Spry's credibility was not a fact of consequence to the action, since he said nothing from the witness stand that either party could have used for its truth to prove a fact of consequence to the action. The court granted S. a new trial since Spry's jailhouse statements to Fuchser was not harmless evidence. The State conceded the testimony was harmful.

Jaime Gutierrez told no story; thus, there was no testimony to impeach. Gutierrez's credibility was not at issue, as he failed to say anything of consequence at trial. He stated he recalled nothing about the incident. The only plausible purpose for

22

Officer Fox's testimony was as substantive evidence of Isidro Licon's guilt. The State does not argue for the applicability of an exception or exclusion to the rule against hearsay, and none seems to apply. The testimony was inadmissible under Washington evidence rules. To assess the scope of the error and determine which harmless error analysis should apply, we reach Isidro Licon's assertion that the testimony's admission violated his rights under the confrontation clause.

ISSUE 3: Did Officer Fox's testimony about Jaime Gutierrez's statement violate the confrontation clause?

ANSWER: Yes.

In addition to violating the hearsay rule, the testimony of Officer Eric Fox violated the constitutional confrontation clause. This court reviews de novo "[a]n alleged violation of the confrontation clause." *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). Under the Sixth Amendment's confrontation clause, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Even hearsay with an applicable exception becomes inadmissible in violation of the clause if it is *testimonial* hearsay. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Thus, we must decide if Eric Fox's repeat of Jaime Gutierrez's statement constituted testimonial hearsay.

A declarant's out of court statement is testimonial if, in the absence of an ongoing

emergency, "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. The admission of testimonial hearsay statements of a witness who does not appear at a criminal trial violates the confrontation clause of the Sixth Amendment unless (1) the witness is unavailable to testify and (2) the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State v. Beadle*, 173 Wn.2d 97, 107, 265 P.3d 863 (2011); 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 1300.8, at 498 (5th ed. 2007).

*Crawford*, the leading United States Supreme Court decision on the subject, did not comprehensively define "testimonial," but it provided some guidance to lower courts. *State v. Chambers*, 134 Wn. App. 853, 860, 142 P.3d 668 (2006). *Crawford*'s few definitions of "testimonial" all contemplate formal statements given to police to help their investigations or formal testimony in a court setting. *See Crawford*, 541 U.S. at 51-52. *Crawford* specifically distinguished these formal statements from casual remarks. *Chambers*, 134 Wn. App. at 862.

In *Chambers*, our court summarized three nonexclusive definitions for "testimonial" offered by *Crawford*:

> (1) ex parte in-court testimony or its functional equivalent, such as affidavits, custodial examinations, and prior testimony that the defendant was unable to cross-examine; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) statements made under circumstances

24

that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Chambers*, 134 Wn. App. at 860-61 (citing *Crawford*, 541 U.S. at 51-52). We find that the third definition applies in this appeal. Under the circumstances of an interview by a law enforcement officer, a reasonable witness would believe his or her statement would further police investigations toward future criminal prosecutions and specifically that such statements "would be available for use at a later trial." *Chambers*, 134 Wn. App. at 861. Stated differently, Jaime Gutierrez should have expected that his remarks to Officer Fox would be used in a criminal trial.

Since we conclude the hearsay on appeal is testimonial hearsay we must complete the confrontational clause analysis. Because Jaime Gutierrez asserted his Fifth Amendment rights, Gutierrez was not available to testify. A witness is unavailable if he asserts the Fifth Amendment when called to testify at trial. *State v. Roberts*, 142 Wn.2d 471, 491, 14 P.3d 713 (2000); *State v. Edmondson*, 43 Wn. App. 443, 447, 717 P.2d 784 (1986). Also, Isidro Licon had no prior opportunity to cross-examine Gutierrez. Thus, the trial court admitted testimonial hearsay in violation of Licon's right to confront witnesses against him.

ISSUE 4: Whether the admission of Officer Fox's testimony about Jaime Gutierrez's statement is harmless error?

ANSWER 4: Yes.

25

The denial of a defendant's constitutional right to cross-examine a witness does not always mandate reversal, but may be found to be harmless error. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *People v. Flowers*, 371 Ill. App. 3d 326, 331, 862 N.E.2d 1085, 308 Ill. Dec. 882 (2007). A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011). This court employs the overwhelming untainted evidence test and looks to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Anderson*, 171 Wn.2d at 770. A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury or trier of fact would reach the same result absent the error and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *State v. Burke*, 163 Wn.2d 204, 222, 181 P.3d 1 (2008); *State v. Benn*, 161 Wn.2d 256, 266, 165 P.3d 1232 (2007); *State v. Thompson*, 151 Wn.2d 793, 808, 92 P.3d 228 (2004); *State v. Linehan*, 147 Wn.2d 638, 643, 56 P.3d 542 (2002); *State v. Brown*, 140 Wn.2d 456, 468-69, 998 P.2d 321 (2000); *State v. Aumick*, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995); *State v. Guloy*, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985). When the error is not harmless, the defendant must have a new trial. *State v. Fricks*, 91 Wn.2d 391, 397, 588 P.2d 1328 (1979).

We conclude that the admission of Jaime Gutierrez's out-of-court statement to

26

Officer Eric Fox was harmless for many reasons. First, the testimony was short lived and not repeated by the State in closing arguments. Isidro Licon's testimony confirmed the truth of one of Gutierrez's remarks—that Licon was present at the Gutierrez home on February 10. Licon did not directly contradict Jaime Gutierrez hearsay comment that Licon carried a gun. Credible testimony established that Licon carried a gun. The jury did not believe Gutierrez's third statement—that the assault was gang-related.

A proper harmless error analysis requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict. *Corona v. State*, 64 So.3d 1232, 1243 (Fla. 2011). In determining the import of inadmissible evidence, a reviewing court should consider the frequency of the error; the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; whether the erroneously admitted evidence duplicates untainted evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case. *State v. Nelson*, 2014 WI 70, 355 Wis. 2d 722, 849 N.W.2d 317, 327. Courts look to three factors to determine whether a trial irregularity warrants a new trial (1) the seriousness of the irregularity, (2) whether the statement was cumulative of evidence properly admitted, and (3) whether the irregularity could be cured by an instruction. *State v. Perez-Valdez*, 172 Wn.2d 808, 818,

27

No. 31670-0-III
*State v. Licon*

265 P.3d 853 (2011); *State v. Post*, 118 Wn.2d 596, 620, 826 P.2d 172 (1992).

Admission of testimony that is otherwise excludable is not prejudicial error where similar testimony was admitted earlier without objection. *Ashley v. Hall*, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999); *State v. Ramirez-Estevez*, 164 Wn. App. 284, 293, 263 P.3d 1257 (2011). When the same fact has been admitted in evidence before the jury, without objection, such admitted evidence renders harmless the admission of the same evidence over objection. *Casey v. State*, 246 Ga. App. 786, 790, 542 S.E.2d 531 (2000). When the improper evidence was merely cumulative, its admission was harmless. *Smith v. State*, 283 Ga. App. 722, 724, 642 S.E.2d 399 (2007).

Some Washington cases are illustrative. In *State v. Burke*, 163 Wn.2d 204, 181 P.3d 1 (2008), the State charged Justin Burke with rape of a child. Burke agreed he had sex with the alleged victim, but testified she told him she was 16 years of age and that he reasonably believed her. During trial, the State presented testimony from law enforcement officers that Burke refused to speak with officers when interviewed by them. Our high court considered the constitutional error to be harmful. A principal reason for the ruling was the State's repeated references to Burke's silence had the effect of undermining his credibility as a witness. In the case on appeal, Officer Eric Fox's testimony of Jaime Gutierrez's statement was short lived. The State did not repeatedly refer to Jaime Gutierrez's out of court remarks or mention the remarks at all in closing arguments.

28

In *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985), as in the case on appeal, the trial court erroneously admitted two out of court statements by a coconspirator that implicated the defendants. At trial, the coconspirator refused to testify under the Fifth Amendment. The jury convicted the defendants of aggravated first degree murder. The Supreme Court acknowledged that the admission of the hearsay violated the defendants' rights under the constitution's confrontation clause. Nevertheless, the court affirmed the convictions on the ground the admission of evidence was harmless. The court noted the overwhelming amount and credibility of the properly admitted evidence. The opinion did not list what constituted the overwhelming evidence nor identify what constituted credible evidence.

In *State v. Anderson*, 171 Wn.2d 764, 254 P.3d 815 (2011), the Supreme Court addressed the admission of statements from a sexual assault clinic nurse concerning a child's sexual molestation. The admission of the statements, although "testimonial" and subject to the defendant's right of confrontation under the Sixth Amendment to the United States Constitution, was harmless. The victim had told the nurse that defendant rubbed his penis. On appeal, the State conceded that the nurse's recitation of the child's statements was "testimonial," but the court concluded that any error resulting from admitting the testimony was harmless. The defendant had earlier admitted the inappropriate touching to an officer. The victim also testified.

In this appeal, the tainted evidence is the testimony of Officer Eric Fox that Jaime

29

Gutierrez told him that Isidro Licon was present at his apartment on February 10 and Licon carried a firearm. Officer Fox also testified that Gutierrez told him that the assault occurred because he was in a relationship with a competing gang member. Removal of this evidence does not unsettle the verdict.

Isidro Licon admitted to being present at the apartment on February 10. Although Gutierrez's statement to Officer Fox implied an assault occurred, the statement provided no details of any assault committed by Licon. Although he claimed self-defense, Isidro Licon also testified to a physical altercation with Cortez. Licon testified he shoved Cortez and punched her in the face. The two struggled with a knife, an instrument considered a deadly weapon. Licon testified that he did not carry a gun after he was convicted of an earlier crime, but he did not deny possessing a gun at Jaime Gutierrez's home on February 10. Both Sylvia Guerra and Selena Cortez confirmed Licon carried a gun.

Isidro Licon may believe that, because his version and his witness' version of the altercation differed from the versions of Sylvia Guerra and Selena Cortez, there was a reasonable doubt as to his guilt. But numbering witnesses does nothing in determining how a jury will rule.

When determining the import of tainted evidence, other reviewing courts review the record to determine what witnesses the jury considered as believable. *Taylor v. State*, 407 Md. 137, 963 A.2d 197, 214 (2009). Harmless error review looks to the basis on

30

which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered was surely unattributable to the error. *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203, 215 (2014).

Reviewing the decisions made by the jury in the case on appeal may conflict with the Washington rule that a court is to determine if any reasonable jury might acquit the defendant. But we find this Washington rule problematic. A jury is comprised of twelve independent thinking people with varying backgrounds and theorizing what an innumerable combination of twelve jurors might rule is difficult. No Washington Supreme Court decision has emphasized the need to consider all possible juries or addressed how the court of appeals ponders the possibilities emanating from many reasonable juries. We believe focusing on the particular jury who rendered the verdict on appeal to be more apt.

Our trial jury must have determined Selena Cortez and Sylvia Guerra to be credible witnesses and Jaime Gutierrez, Guillermo Tapio and Isidro Licon to be less than credible witnesses. The jury accepted Cortez's and Guerra's version of the altercation and testimony that Licon attacked the two because of the removal of Gooma Gutierrez from the home, not because of any gang motive. Assuming a jury finding of the possession of a firearm was needed to establish assault with a deadly weapon, the jury

31

would have agreed with Cortez and Guerra that Isidro Licon held a gun. This testimony

also established Gutierrez unlawfully possessed a gun.

ISSUE 5: Did the trial court err by refusing to issue a material witness warrant

for Jaime Gutierrez?

ANSWER 5: No.

Under CrR 4.10, on motion, the court may issue a warrant for the arrest of a

material witness. The rule reads, in relevant part:

> **(a) Warrant.** On motion of the prosecuting attorney or the
> defendant, the court may issue a warrant, subject to reasonable bail, for the
> arrest of a material witness. The warrant shall issue only on a showing, by
> affidavit or on the record in open court, that the testimony of the witness is
> material and that
> (1) The witness has refused to submit to a deposition ordered by the
> court pursuant to rule 4.6; or
> (2) The witness has refused to obey a lawfully issued subpoena; or
> (3) It may become impracticable to secure the presence of the
> witness by subpoena.

A trial court's decision to grant or deny a motion for issuance of a material witness

warrant is reviewed for a manifest abuse of discretion. *City of Bellevue v. Vigil*, 66 Wn.

App. 891, 895, 833 P.2d 445 (1992). The proponent of the warrant carries the burden of

showing materiality. *State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984).

We question whether Isidro Licon requested a warrant for Jaime Gutierrez's arrest

during trial. His counsel merely stated: "I know I would anger the Court if I asked for a

material witness warrant." RP at 466. We proceed as if Licon requested a warrant,

nonetheless, because the trial court responded: "I'm not inclined to grant a material witness warrant at this junction of this case. I understand if it was probably more relevant I might do it. If he was one of your primary witnesses that hadn't come." RP at 467.

Isidro Licon claims that Jaime Gutierrez's presence was needed because Gutierrez would have testified that he no longer wanted to lie for Sylvia Guerra. The trial court sat through the entire trial and was in a better position to weigh the importance, or lack thereof, of such testimony. When issuing its ruling, the trial court had already observed Gutierrez's demeanor on the stand and his refusal to answer questions under the Fifth Amendment. We will not interfere in the trial court's determination that any such testimony was unimportant.

ISSUE 6: Did cumulative error deny Isidro Licon a fair trial?

ANSWER 6: No.

Under the cumulative error doctrine, a defendant may be entitled to a new trial when the trial court's multiple errors combined to deny the defendant a fair trial. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). The defendant bears the burden of proving an accumulation of error of sufficient magnitude to warrant a new trial. *Lord*, 123 Wn.2d at 332; *see, e.g., State v. Perrett*, 86 Wn. App. 312, 323, 936 P.2d 426 (1997). A defendant is entitled to a fair trial but not a perfect one, for there are no

perfect trials. *Brown v. United States*, 411 U.S. 223, 232, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973).

We have already ruled that the court committed only one error that was harmless. Therefore, we conclude there was no cumulative harmful error.

ISSUE 7: Did the trial court err by imposing legal financial obligations?

ANSWER 7: We decline to address this assignment of error.

Isidro Licon contends the trial court erred when it, (1) found he had the present or future ability to pay LFOs, and (2) imposed $643 in discretionary LFOs without considering his ability to pay. Courts may impose legal financial obligations, such as court costs, DNA collection fees, and victim restitution, if a defendant has or will have the financial ability to pay them. RCW 10.01.160(3); RCW 9.94A.760(2); *State v. Curry*, 118 Wn.2d 911, 914-16, 829 P.2d 166 (1992). The trial court need not make a formal finding that the defendant has or will have the ability to pay. *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116 (1991). But where the court does make such a finding, the record must support it. *State v. Bertrand*, 165 Wn. App. 393, 403-05, 267 P.3d 511 (2011). This court reviews a trial court's determination of an offender's financial resources and ability to pay for clear error. *Bertrand*, 165 Wn. App. at 404 n.13 (citing *Baldwin*, 63 Wn. App. at 312).

Isidro Licon did not object to the imposition of LFOs at sentencing. Under RAP 2.5(a), this court need not address this issue for the first time on appeal. Until our

34

Supreme Court decides otherwise, the rule established by each division of this court is that a defendant may not challenge a determination regarding his or her ability to pay LFOs for the first time on appeal. *State v. Duncan*, 180 Wn. App. 245, 252, 327 P.3d 699 (2014) (citing RAP 2.5(a) and *State v. Kuster*, 175 Wn. App. 420, 425, 306 P.3d 1022 (2013)); *State v. Calvin*, 176 Wn. App. 1, 316 P.3d 496, 507-08, *petition for review filed*, No. 89518–0 (Wash. Nov. 12, 2013); *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *review granted*, 178 Wn.2d 1010, 311 P.3d 27 (2013).

We decline to address this assignment of error for another reason. The State has not sought to enforce the legal financial obligations. If it later does, Isidro Licon may petition the court for remission under RCW 10.01.160(4), which states:

> A defendant who has been ordered to pay costs . . . may at any time petition the sentencing court for remission of the payment of costs or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the court may remit all or part of the amount due.

ISSUE 8: Did the trial court err by imposing community custody conditions?

ANSWER 8: No.

Isidro Licon challenges three community custody conditions: no contact with known gang members, no possession of gang paraphernalia, and notifying the community corrections officer of any vehicles Licon owns or regularly drives. Licon did not object

35

to these conditions below, but may challenge them for the first time on appeal. *State v. Jones*, 118 Wn. App. 199, 204, 76 P.3d 258 (2003).

This court reviews sentencing conditions for abuse of discretion. *State v. Crockett*, 118 Wn. App. 853, 856, 78 P.3d 658 (2003). This court reverses only if the decision is manifestly unreasonable or based on untenable grounds. *State v. Williams*, 157 Wn. App. 689, 691, 239 P.3d 600 (2010).

As a part of any sentence, the trial court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter. RCW 9.94A.505(8). A "crime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). In turn, "'[c]ircumstance' is defined as '[a]n accompanying or accessory fact.'" *Williams*, 157 Wn. App. at 692 (quoting BLACK'S LAW DICTIONARY 277 (9th ed. 2009)). The courts strive to protect freedom of speech, religion, and racial equality, but freedom of association may be restricted if reasonably necessary to accomplish the essential needs of the state and public order. *Malone v. United States*, 502 F.2d 554, 556 (9th Cir. 1974). No causal link need be established between the condition imposed and the crime committed, so long as the condition relates to the circumstances of the crime. *Williams*, 157 Wn. App. at 691-92.

The trial court did not abuse its discretion in imposing gang-related community custody conditions. As discussed above, the assaults were gang-related, even though the

jury ultimately concluded the assaults neither advanced Licon's standing within Florencia 13 nor benefitted the gang. Isidro Licon arrived with other gang members at a gang member's home to discuss the removal of the one member's brother to accommodate an assertive female member of a different gang.

The trial court did not abuse its discretion in requiring Isidro Licon to report any vehicle he owns or regularly drives. Licon rode as a passenger in a vehicle to Sylvia Guerra's home on February 10, 2012, and fled from the altercation in a vehicle. The reporting requirement directly relates to these accompanying, accessory facts.

## CONCLUSION

We affirm Isidro Licon's three convictions and his sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____       _____
Brown, A.C.J.                          Korsmo, J.

37