# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON )
            )   No. 71026-5-I
         Respondent, )
            )   DIVISION ONE
      v.           )
            )   UNPUBLISHED OPINION
ROBERTO GONZALEZ-MENDOZA, )
            )
         Appellant. )   FILED: August 10, 2015

TRICKEY, J. — In order to impose a deadly weapon enhancement, the statute[1] requires both that the weapon be deadly and that it be used in a deadly manner. Here, the jury was not instructed about the manner of the weapon's use. Because this instructional error involved an omission of an essential element, it was of constitutional magnitude and, under the circumstances here, the error was not harmless.

Roberto Gonzalez-Mendoza also assigns error to various evidentiary rulings made during his trial for first degree rape. The trial court did not abuse its discretion in making the evidentiary rulings challenged by Gonzalez-Mendoza.

Accordingly, we affirm the conviction for first degree rape, but reverse the deadly weapon enhancement conviction and remand for resentencing.

## FACTS

The complainant was working as a prostitute in downtown Seattle. According to her testimony, she had run out of condoms and was leaving to go home when Gonzalez-Mendoza rolled down the window of his pickup truck trying to get her attention. Once a price of $80.00 was established, the complainant went

---

[1] Former RCW 9.94A.602 (1983) (recodified as RCW 9.94A.825 by Laws of 2009, ch. 28, § 41).

with Gonzalez-Mendoza. On arriving at the secluded area she designated, Gonzalez-Mendoza did not have sufficient funds. When he put his wallet back, she testified that she was expecting him to either taker her back or go to an ATM (automated teller machine) to get the money.

Instead, Gonzalez-Mendoza pulled out a large kitchen knife, approximately 13-inches in length. He placed it near the complainant's throat. Gonzalez-Mendoza forced her to perform oral sex twice. He then partially put a condom on, forcing her to have vaginal intercourse.

Afterward, Gonzalez-Mendoza drove her back to a parking lot, cursing at her to get out of the truck. The complainant testified that she was worried because he had driven past the parking lot where he had picked her up. Terrified that Gonzalez-Mendoza was going to run her down, the complainant turned the truck off and grabbed the truck's keys. Gonzalez-Mendoza followed her out and tackled her to the ground. Gonzalez-Mendoza punched her and took both his keys and her keys. She immediately called 911 and reported the license plate number of the truck.

The police took the complainant to Harborview where a rape kit was taken. The complainant identified Gonzalez-Mendoza's photograph from a photomontage Detective Robert Kurosu gave her.

Gonzalez-Mendoza admitted to having sexual relations with the complainant, but contended it was consensual. He testified that he was married and had three children. Gonzalez-Mendoza said he decided to visit a prostitute because he was having trouble with his wife and that "[he] wasn't satisfied."[2] He

---

[2] Report of Proceedings (RP) (Aug. 13, 2007) at 10.

2

admitted that he had both oral and vaginal sex with the complainant, but that it was consensual. He claimed that the complainant asked for more money after they had finished having sexual relations. He testified that she grabbed his keys, but the key that was in the ignition stayed there. Gonzalez-Mendoza stated that he tackled her to recover his keys, which she had grabbed. While this was ongoing, the truck moved forward, banging into the wall. He denied having a knife.

The police arrested Gonzalez-Mendoza. The knife was not recovered.

A jury convicted Gonzalez-Mendoza of first degree rape with a deadly weapon enhancement. He contends the court made errors in its evidentiary rulings and gave an erroneous instruction on the deadly weapon enhancement.

ANALYSIS

I.    Evidentiary Rulings

Gonzalez-Mendoza makes several evidentiary challenges. He contends the trial court erred in excluding trace biological material and evidence of the complainant's prior contact with police in which she gave a false name. He also asserts the trial court erred in admitting his prior assault conviction.

We review evidentiary rulings for abuse of discretion. State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). An appellate court will overturn the trial court's rulings on the admissibility of evidence only if its decision was manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons. State, ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Trace Evidence

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence." ER 401. Evidence that is not relevant is not admissible. ER 402.

The State moved in limine to preclude trace biological material found on the anal swabs under both rape shield and relevance. The trial court reserved its ruling stating:

> All right. Then I will -- at this point I really don't see that it's relevant given the DNA [(deoxyribonucleic acid)] technician or lab technician can say anything more than trace evidence. But possibly on this issue of condom use it may go to credibility of the alleged victim. So once her cross-examination and/or her examination is completed, then I think I can determine whether or not there's any relevance to that information. As I say, I still don't see that it's of any particular prejudice to the State, but I also don't at this point see any real relevance to it, and so we will have to wait and see how the alleged victim's testimony plays out. So I will reserve on that one.[3]

After the complainant testified about her interaction with Gonzalez-Mendoza, the court considered the State's motion to exclude evidence from Amy Jagmin, the forensic scientist who analyzed the DNA. Jagmin found trace material of limited genetic information. She opined that the trace material "speaks to something less recent than the current evidence that is pertaining to this case. But with regard to actual time frames, [she] can't give specific[s]."[4]

The defense sought to impeach the victim with this evidence as proof that she had multiple partners that evening, contradicting her statement to the detective that she had only had one previously. But the complainant had already testified that she had at least two partners prior to the sexual contact with Gonzalez-Mendoza. She also testified that she had had sexual relations with her boyfriend approximately two days earlier. Because the witness could not place the trace

---

[3] RP (Aug. 6, 2007) at 95.
[4] RP (Aug. 9, 2007) at 16.

material in any time frame, it would be mere conjecture that it came from that evening.

Gonzalez-Mendoza argued that the evidence was admissible to show that the complainant was less than truthful because she testified that she used condoms with several of her "Johns" for various reasons. Although the complainant testified that she used condoms when working as a prostitute, she did not state that she only did so. Nor did she state that she used condoms when she had relations with her boyfriend a couple of days prior to the incident.

Although evidence offered to impeach a person is relevant if it tends to cast doubt on a person's credibility and that credibility is a fact of consequence to the action, a witness may not be impeached on a collateral manner. State v. Aguirre, 168 Wn.2d 350, 362, 229 P.3d 669 (2010). Here, the evidence of unknown trace material found on the complainant's body, although not attributable to either the defendant or the complainant, is not relevant to whether there was a rape. It does not make the existence of any fact of consequence to that determination. The trial court did not abuse its discretion in excluding this evidence.

Complainant's Prior Bad Act

The State sought to preclude the defense from soliciting information regarding the complainant's proffering a false name in her prior contact with the police. The defense argued that the evidence was admissible to impeach the complainant's credibility because she had used a false name in several instances where she had been arrested for various types of crimes. The defense agreed that the crimes which she might have been arrested for were not admissible. The

defense argued, however, that her giving a false identify to the police was relevant as to her credibility.

The State argued that there was only one verifiable instance where the complainant had given a false name in an unrelated incident. The information regarding the giving of a false name was obtained from an interview with a detective and a deputy prosecuting attorney where the complainant admitted that she once had given the police a false name, but was never charged with a crime relating to the incident. The State further argued that there was no evidence in the record that the complainant's giving a false name was close in time to the rape or trial, such that it would be probative of the complainant's credibility in this case.

The court ruled that it was disingenuous that the defense was prohibited from bringing up past crimes, but could somehow bring up the fact that the complainant gave a false name when confronted regarding one of those crimes. The court found the false name was not probative of the complainant's credibility as to her testimony regarding the rape.

ER 608 permits a party to cross-examine a witness about specific instances of past conduct in order to cast doubt on the witness's credibility.[5] Credibility impeachment questions must be relevant to the truthfulness of the witness's

---

[5] ER 608(b) provides:
> **Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

present testimony. State v. Benn, 120 Wn.2d 631, 651-52, 845 P.2d 289 (1993). Such evidence is relevant if it casts doubt on the witness's credibility, or the witness's credibility is a "fact of consequence" to the trial. State v. Allen S., 98 Wn. App. 452, 459-60, 989 P.2d 1222 (1999). A defendant's proffered evidence "'must be of at least minimal relevance'" and he or she cannot avoid this requirement simply because that evidence is about a past crime in which the witness gave a false name. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). But a trial court may exclude evidence of specific instances of conduct for impeachment if it is remote in time. State v. Wilson, 60 Wn. App. 887, 893, 808 P.2d 754 (1991).

This evidence was essentially improper propensity evidence, which is generally inadmissible under ER 404(b) and improper impeachment under ER 608(b). The trial court did not abuse its discretion in excluding the evidence.

Defendant's Prior Assault Conviction

Gonzalez-Mendoza testified on direct examination that he visited a prostitute because he was having marital problems and was not satisfied in his marriage. On cross-examination, in response to the State's question regarding his frustration (the reason he proffered for seeking a prostitute), Gonzalez-Mendoza stated: "I'm not a person who gets irritated or I'm not an aggressive [person]."[6]

The trial court ruled that the State could cross-examine Gonzalez-Mendoza about his misdemeanor assault conviction from May 2006, but limited it to the conviction and not the fact that it was for domestic violence of his wife.

---

[6] RP (August 13, 2007) at 38.

7

When a party introduces evidence that would be inadmissible if offered by the opposing party, that party opens the door to the explanation or contradiction of that evidence. State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006). "[A] trial court has discretion to admit evidence that might otherwise be inadmissible if the defendant opens the door to [that] evidence." State v. Warren, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006). This court reviews a trial court's determination that a party has opened the door for abuse of discretion. Ortega, 134 Wn. App. at 626.

Here, Gonzalez-Mendoza put his character at issue by his own testimony, opening the door to the admission of evidence of his prior conviction. There was no abuse of discretion.

## II.  Deadly Weapon Enhancement

Gonzalez-Mendoza argues that his due process right was violated because the jury was not properly instructed on the definition of "deadly weapon" for purposes of the special verdict.

An appellate court reviews instructional errors de novo. State v. Brett, 126 Wn.2d 136, 171, 892 P.2d 29 (1995). A jury instruction that omits or misstates an element is subject to harmless error analysis to determine whether the error has relieved the State of its burden to prove each element. State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002). A constitutional error is harmless only if the appellate court is convinced beyond a reasonable doubt that the jury would have reached the same result in the absence of the error. Brown, 147 Wn.2d at 341.

When Gonzalez-Mendoza committed the offense, former RCW 9.94A.602 was in effect and defined "deadly weapon" as an instrument having the capability of inflicting death "and from the manner in which it is used, is likely to produce or

8

may easily and readily produce death." The statute further specified that a knife having a blade longer than three inches was included in the term deadly weapon. Former RCW 9.94A.602. In order to enhance the sentence, the jury needed to determine both that the weapon was deadly and that it was used in a manner that was capable of producing death.

The jury was given instructions with two different definitions of "deadly weapon," one to convict him of the underlying offense, and one for a deadly weapon sentencing enhancement without adequately informing the jury of the definition of a deadly weapon needed to convict for the enhancement.

Instruction 5, the "to convict" instruction, provided that the jury must find that "the defendant used or threatened to use a deadly weapon or what appeared to be a deadly weapon."[7] Instructions 6, 7, 8, and 9 defined the elements contained in the "to convict" instruction.

Instruction 8, pertaining to the deadly weapon, provided:

> Deadly weapon also means any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.[8]

Instruction 14 provided:

> For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime.
>
> A person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use. The State must prove beyond a reasonable doubt that there was a connection between the weapon and the defendant. The State must also prove beyond a

---

[7] Clerk's Papers (CP) at 30.
[8] CP at 33.

reasonable doubt that there was a connection between the weapon and the crime.

A knife having a blade longer than three inches is a deadly weapon.[9]

Gonzalez-Mendoza argues that the jury was given the definition of deadly weapon only pertaining to the deadly weapon element of the substantive offense, thus relieving the State of the burden of proving the enhancement.

The State argues that because the jury was instructed that a knife longer than three inches was a deadly weapon, it sufficed to support the enhancement. The State's reliance on State v. Rahier, 37 Wn. App. 571, 681 P.2d 1299 (1984), is misplaced. In Rahier, the focus was on whether or not the implement was a deadly weapon, not whether it was deadly because of "the manner in which it [was] used."

In a footnote in its brief, the State cites State v. Samaniego, 76 Wn. App. 76, 882 P.2d 195 (1994), to support its argument that the manner in which a weapon is used is not necessary when the weapon is a deadly weapon per se. Samaniego is not particularly helpful. Samaniego was a bench trial and did not involve jury instructions. Samaniego stipulated to the facts in the record and the court found that the knife was readily available. Further, a judge conducting a bench trial is presumed to know and apply the correct law. State v. Read, 147 Wn.2d 238, 242, 53 P.3d 26 (2002); State v. Adams, 91 Wn.2d 86, 586 P.2d 1168 (1978).

The definitions of "deadly weapon" for purposes of elevating the crime to first degree rape and for purposes of the special enhancement statute are distinct.

---

9 CP at 40.

The jury was not instructed on an element of the crime, i.e., "the manner in which [the weapon was] used."

Here, there was no knife found. The evidence was not overwhelming. The only testimony regarding the knife was given by the complainant. The jury would have had to find that it believed her testimony about the manner in which the knife was used. But they were not instructed to do so.

We affirm the conviction for first degree rape, but reverse the conviction for the enhancement and remand for resentencing.

_Trickey, J_

WE CONCUR:

_Spearman, J_                    _Becker, J_

2015 AUG 10 AM 9:00
COURT OF APPEALS
STATE OF WASHINGTON